# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................. 1

II.  FACTS .............................................................................................. 2

   A.  Background ................................................................................. 2

   B.  Material Facts ........................................................................... 12

      1.  The lighting was adequate. ................................................... 12

      2.  Matson Navigation had no knowledge of or in the exercise of reasonable care had no reason to know of the hazards alleged by Meyer and, therefore, had no duty to correct or to warn of the alleged hazards .......... 13

         a.  Matson Navigation had no knowledge that the opening between the hatch cover and the catwalk was a safety hazard. ................................. 13

         b.  A pre-start cargo inspection was performed and no safety hazards were noted. ........................................................................................ 14

         c.  Meyer had notice of the alleged dangerous conditions in question ....... 14

            (1)  Meyer had prior knowledge of vessel and carriage of livestock on vessel ....................................................................................... 14

            (2)  Meyer had prior knowledge of animal feces. .................................. 16

            (3)  Meyer had prior knowledge of possibility of slippage from animal feces ......................................................................................... 18

            (4)  Meyer had prior knowledge that placing his foot on the padeye was unsafe. ...................................................................................... 18

            (5)  Meyer had prior knowledge of an opening on the hatch cover in question. ...................................................................................... 19

III.    ARGUMENT ........................................................................................ 20

   A.  Standard of Review ...................................................................... 20

   B.  Meyer misunderstands Matson Navigation's duties under the Longshore and
       Harbor Workers Compensation Act, 33 U.S.C. §901 et seq. ........................ 21

       1.  The Scope of the Turnover Duty of Safe Condition ................................. 21

           a.  The Law Regarding Unsafe Conditions Involving Cargo ..................... 22

           b.  The Law Regarding Unsafe Conditions Involving The Vessel and Its
               Equipment ................................................................................ 24

       2.  There is no Turnover Duty to Warn that is applicable to this case. ........... 26

       3.  Examples of the Application of *Scindia* turnover duties to slip-and-fall
           cases. ......................................................................................... 26

       4.  Examples of the Application of *Scindia* turnover duties to dangerous
           conditions arising from the design of the vessel and/or its equipment. ..... 28

IV.    CONCLUSION ................................................................................... 30

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Bjaranson v. Botelho Shipping Corp.*, 873 F.2d 1204 (9th Cir. 1988)... 25, 26

*Burns v. D. Oltmann Maritime PTE Ltd.*, 901 F. Supp. 203 (E.D.Va. 1995) .................................................................................................... 29

*C" (J)*, 2003 U.S. Dist. LEXIS 8453 (E.D. La. May 19, 2003).............. 27, 28

*Celotex Corp. v. Catrett*, 477 U.S. 317, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).................................................................................... 20

*Clay v. Daiichi Shipping*, 74 F. Supp. 2d 665 (E.D. La. 1999) .................... 23

*Commodity Futures Trading Commission v. Savage*, 611 F.2d 270 (9th Cir. 1979) ...................................................................... 20

*Haines v. Honolulu Shipyard, Inc.*, 125 F. Supp. 2d 1020 (D. Haw. 2000) ......................................................................................... 28, 29

*Howlett v. Birkdale Shipping Co.*, 512 U.S. 92, 114 S. Ct. 2057, 129 L. Ed. 2d 78 (1994)........................................................................ 22, 23

*Martinez v. Korea Shipping Corp.*, 903 F.2d 606 (9th Cir. 1990) ......... 24, 25

*Pimental v. Ltd Canadian Pacific Bul*, 965 F.2d 13 (5th Cir. 1992)...... 26, 27

*Pledger v. Phil Guilbeau Offshore, Inc.*, Civil Action No. 02-1796, Section L(1), 2003 U.S. Dist. LEXIS 7416 (E.D. La. May 1, 2003) ...... 27

*Quevedo v. Trans-Pacific Shipping, Inc.*, 143 F.3d 1255 (9th Cir. 1998) ........................................................................................... 2

*Riggs v. Scindia Steam Navigation Co.*, 8 F.3d 1442 (9th Cir. 1993).......... 22

*Scindia Steam Navigation Co., Ltd. v. De Los Santos*, 451 U.S. 156, 101 S. Ct. 1614, 68 L. Ed. 2d 1 (1981)..................................... 21

*State Farm Fire & Casualty Co. v. Martin*, 872 F.2d 319 (9th Cir. 1989) ...................................................................................... 20

*T.W. Electric Serv., Inc. v. Pac. Electric Contractors Association*, 809 F.2d 626 (9th Cir. 1987) ........................................................ 20

*Thomas v. Newton International Enterprises*, 42 F.3d 1266 (9th Cir. 1994) ........................................................................................ 21

## DOCKETED CASES

*Irvin v. United States Military Sealift Command*, Civil Action No. 01-2634 ................................................................................................ 27

## FEDERAL STATUTES

Fed. R. Civ. P. 56(c) ........................................................................... 20

Fed. R. Civ. P. 56(e) ........................................................................... 20

*Hayes v. Hoyu Venture Line* S.A., 1998 ........................................... 23

Longshore and Harbor Workers Compensation Act, 33 U.S.C. §901 et seq ......................................................................................................... 21

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| BERT MEYER,<br><br>    Plaintiff,<br><br> vs.<br><br>MATSON NAVIGATION COMPANY, INC.; and PACIFIC LIVESTOCK, INC.,<br><br>    Defendants. | CIVIL NO. 1:04cv 00049JMS-BMK (In Admiralty)<br><br><br>MEMORANDUM IN SUPPORT OF MOTION |

## MEMORANDUM IN SUPPORT OF MOTION

### I. INTRODUCTION

The instant lawsuit involves a slip-and-fall aboard the *Lihue* on

October 1, 2002. Defendant Matson Navigation Company, Inc. ("Matson

Navigation"), was the owner of the *S/S Lihue*,[1] the vessel on which Plaintiff Bert

Meyer ("Meyer"), an experienced longshoreworker, allegedly slipped on animal

urine and feces, thereby causing him injuries.[2]

---

[1] *See* Defendant Matson Navigation Company, Inc.'s Separate and Concise Statement in Support of Motion for Summary Judgment ("SCS"), at ¶1.

[2] Co-Defendant Pacific Livestock had cargo aboard the vessel in the form of containers carrying pigs. It is alleged by Meyer that he slipped on urine and animal feces which was caused by Pacific Livestock's cargo.

As a matter of law, Matson Navigation cannot be held liable to Meyer for the claims asserted against it because the allegedly dangerous conditions in question were open and obvious to Meyer and should have been avoided by him – an expert and experienced longshoreworker.

## II.    FACTS

### A.    Background

Meyer claims that on October 1, 2002, at approximately 7:00 p.m., he slipped on a padeye located on a hatch cover on the *S/S Lihue* between rows 15 and 16. At the time of the accident, he was working as a longshoreworker for Matson Terminals, Inc.[3]

Meyer has provided different descriptions of how the accident occurred. The first version of the accident was described in a recorded interview conducted by Heidi Kahlbaum of Frank Gates Acclaim on October 17, 2002. *See* Exh. A, attached to SCS.[4]

---

[3]    At the time of the accident, Meyer was on labor loan (i.e. a "borrowed-servant") to the stevedore, Matson Terminals, Inc. ("Matson Terminals").

[4]    Frank Gates was the adjuster that was investigating the accident in connection with Meyer's longshore claim against Matson Terminals. Matson Navigation is a separate company from Matson Terminals. Matson Navigation is the shipowner. Matson Terminals is a stevedore. *See Quevedo v. Trans-Pacific Shipping, Inc.,* 143 F.3d 1255, 1258 (9th Cir. 1998) (rejecting view that shipowner can be held liable for negligence of stevedore because "the LHWCA would become a vehicle

2

A lengthy excerpt from the interview is provided to give the Court an understanding of Meyer's recollection *approximately two weeks after the accident*.

**Adjuster:**   And then what happened?

**Claimant:**   Um . . . I was stepping over some rods and stuff and I guess the lock cover, everything was covered with pig urine and stuff over there, cause that's where the pigs were. So when I stepped on, um, I believe it's called the, the D rings but they were actually, we bolt the buckles too and then, um, I put my foot there cause I had to step over some rods and stuff and then when I went to put my weight on it, it just slid right into the hole.

\* \* \*

**Claimant:**   Cause I didn't, I didn't realize that my left . . . I didn't realize there was a hole there. Cause I couldn't see anything.

**Adjuster:**   Okay. And this is your, which foot?

**Claimant:**   My left foot.

\* \* \*

**Adjuster:**   Okay. Okay and you said you put your left foot on the. . .

**Claimant:**   It's like a buckle.

**Adjuster:**   Okay.

**Claimant:**   To step over all the rods.

---

for longshoremen to "put all costs on the party who is least able to avoid the accident, the vessel. More importantly, LHWCA will completely eliminate the incentive to act with caution of the party who is in the best position to avoid the accident, the stevedore.") (citations and quotations omitted).

3

* * *

**Claimant:**  <u>So basically I was on the catwalk and I put my foot on the deck and tried to get over and then basically that's when I think I lost my footing.</u>

* * *

**Claimant:**  . . . <u>So I was putting out all the poles and everything. And then I got over that fine and then I didn't realize that there was another small little hole between the deck and the catwalk.  Cause actually the catwalk extended past that.  It was just that there was a little hole, like on the, I guess, the edge of the, um, the lid.</u>

**Adjuster:**  Yeah.  Um-hm.

**Claimant:**  The container lid. . . The deck lid.

**Adjuster:**  Yeah.

**Claimant:**  So I didn't realize there was a little hole there, cause you couldn't see anything.

Exh. A, attached to SCS, at pp. 13-16 (emphasis added).

**Claimant:**  I should made a little space, but then um. . .So I have a walkway, but over here there is a section of the catwalk that was missing.  So I got over that and then there was this little hole over here which I. . . you know, there's everything extending, <u>so I put my foot on the buckle here and that's where my foot went.</u>

* * *

**Claimant:**  My foot just went right down and it. . .  I was expecting it to hit the ground and then the next thing, you know, it just went straight in.

Exh. A, attached to SCS, at p. 18 (emphasis added).

**Claimant:**  I have two poles.  I believe I had a. . . a one high pole and a two high pole with me.

**Adjuster:**  Okay.  So you had 2 poles in your, in your arms, yeah?

**Claimant:**  Yeah.

**Adjuster:**  Okay.  And then, um, so basically you're really just walking and then you have to get around the poles.

**Claimant:**  Okay.  I got over there, so then I had to, um, they had buckled down, um. . .  The lashing and everything that they had dropped already, you know, the rods and the buckles.

**Adjuster:**  Um-hm.

**Claimant:**  <u>I was stepping over that.</u>

Exh. A, attached to SCS, at p. 21 (emphasis added).

**Adjuster:**  Okay.  Now do you think, um, did your foot slip or anything?

**Claimant:**  Yeah, cause I was stepping on a. . .  I was stepping on a buckle, so I pretty, I thought I had pretty good solid footing and then I guess when I put all my weight on it, It just slipped.

**Adjuster:**  Um-hm.

**Claimant:**  And just went right into the hole.

Exh. A, attached to SCS, at p. 25.

**Adjuster:**  Okay.  Um. . .Okay.  What, well, as far as the accident, what happened?  How it happened, basically, I think lighting was an issue, but what you just basically said, you know, I know the hole was there. . . It kind of. . . a certain accident.

5

**Claimant:**    Yes, it's an accident, I mean.

**Adjuster:**    <u>There's nothing to do with negligence here</u> or. . .

**Claimant:**    <u>No</u>, just the light. . .I mean even with the lighting you
have to step over so much stuff it's hard.  <u>There's no way to point</u>
<u>fingers</u>, I mean, everyone was saying it was my fault, cause I stepped
in a hole or I was, like, you know, to me it's even when I hurt my
shoulder it's just an accident.

Exh. A, attached to SCS, at p. 54 (emphasis added).

**Claimant:**    <u>I don't think, there's, to me, it's nobodies fault.</u>  I mean.

Exh. A, attached to SCS, at p. 55 (emphasis added).

**Adjuster:**    And was the information provided accurate to the best of
your knowledge?

**Claimant:**    Yes.

Exh. A, attached to SCS, at p. 56.

On May 21, 2004, Meyer responded to Matson's first request for

answers to interrogatories with a different account of the incident.  In his

responses, he described the accident as follows:

I was <u>unlashing cones</u> with a pole between rows 15 and 16.  My <u>left</u>
<u>foot was on the catwalk</u> and my <u>right foot was on a padeye</u> on the
hatch lid.  My <u>right foot slipped</u> and I lost my balance and fell.  My
left leg went into the gap between the catwalk and the hatch lid and I
was stuck.  I was yelling for help for awhile, then <u>Danny Kaneala</u>
helped me get out of the gap.

Exh. B, attached to SCS, at p. 6.  He claimed Matson Navigation was negligent

because

> [t]he whole area was covered in pig urine and feces so it made it real
> slippery.  Also, there should have been a guardrail or cover to prevent
> me from falling into the gap between the catwalk and the hatch cover.

Exh. B, attached to SCS, at p. 6.

Through his answers to interrogatories, Meyer altered his story in

various ways. He contended that, at the time of the accident, he was unlashing

cones – a departure from his previous position that he was walking along the

catwalk and avoiding rods and other materials left on the catwalk by his co-

workers.  He claims his left foot was on the catwalk and his right foot was on a

padeye located on the hatch lid. He further claims that his "right foot slipped" – a

departure from his initial claim that his left foot slipped.  For the first time, he

claims he slipped on a "padeye" –before it was a "buckle".  And, finally, he claims

Matson Navigation was negligent because "there should have been a guardrail or

cover to prevent me from falling into the gap between the catwalk and the hatch

cover." Once litigation was commenced – sometime between his interview and his

interrogatories – he reconsidered his view that it was "nobodies fault".

On September 27, 2004, Meyer amended his previous interrogatory

response describing the accident as follows:

> I was unlocking a cone with a pole between rows 15 and 16. My <u>right foot was on the catwalk</u> and my left foot was on a padeye on the hatch lid. My <u>left foot slipped</u> and I lost my balance and fell. My left leg went into the gap between the catwalk and the <u>inshore side of the hatch lid</u> and I was stuck. I was yelling for help for awhile, then <u>Dan Farney</u> helped me get out of the gap.

Exh. C, attached to SCS, at pp. 1-2. Realizing his initial response was almost physically impossible to do, Meyer reversed his previous testimony by contending that his right foot was on the catwalk and his left foot slipped on the padeye. He also mentioned for the first time that the accident occurred on the "inshore side of the hatch lid". He clarified that it was Dan Farney,[5] the Matson Terminals superintendent, not Danny Kaneala, who came to his rescue.

We now turn to Meyer's deposition which was taken on August 31, 2004. His deposition testimony turned into a "hybrid" of his recorded interview and discovery responses:

> Q.    Now, focusing on the containers in row 15, where did you start your process of unlocking the cones? Is it on the in-shore or the outside?
>
> A.    In-shore.
>
> Q.    So had you moved from in-shore all the way across to the harbor side of the container row?
>
> A.    Yes.
>
> Q.    And you had unlocked all the cones?

---

[5]    This was verified by Dan Farney during his deposition.

A.    Yes.

Q.    And do you recall how many had stuck?

A.    Two.

Q.    Okay.  And where are they located?

A.    One was in the middle and one was on the in-shore.

Exh. D, attached to SCS, at p. 43:9-24.

Q.    So after the one in the middle that was stuck was released, then you moved to the in-shore?

A.    Yes.

Q.    Was it the most in-shore container?

A.    No.

Exh. D, attached to SCS, at p. 45:3-8.

Q.    As you moved along the catwalk for row 15, first of all, can you describe what the catwalk is made out of?

A.    Wire grates.

Q.    And was it in place all the way across from the in-shore to the harbor side of the roof?

A.    There's one section missing.

Q.    And where was that?

A.    It was a quarter way in.  I can't say.

Exh. D, attached to SCS, at p. 45:16-24.

Q.    So you actually looked and saw that it was missing?

A.    Yes.

Q. Do you recall about how large that missing section was?

A. About three to four feet.

           \* \* \*

Q. So how did you traverse that area?

A. Stepped over.

Exh. D, attached to SCS, at pp. 46:20-47:10.

It is the following testimony that is inconsistent with his recorded statement indicating that he was injured while walking along the catwalk and avoiding lashing rods and other equipment.

Q. Now, at the containers on the in-shore side that was stuck, do you recall how high that stack was?

A. I believe it was the third container up.

Q. And so you had a pole that has a three-high pole?

A. I call it the two-high pole. It reaches the top of the two high container.

Q. So you were able to reach it while standing on a grate?

A. No.

Q. What do you have to do to reach it?

A. I have to get my body directly underneath the can to put the pole as vertical as possible.

Q. Why?

A. So I could twist it to the side.

Q. And if you stand on the grate, can you reach and twist the cone?

10

A.    No.

Q.    So then you needed to stand on what to get as close to the can as possible?

A.    I needed to get right up against the can so I stood on a D-ring. . . Padeye sorry.

\* \* \*

Q.    To stand on the padeye, was that necessary to give you more elevation or was it just because that was where you stepped?

A.    That's where my foot had to be.  I had to get right up in line with that cone.

Q.    The padeye that you're referring to is attached to the hatch cover?

A.    Yes, sir.

Exh. D, attached to SCS, at pp. 48:13-50:3.

Q.    So, when you got to the in-shore container that you needed to twist the lock, describe for me exactly what you did?

A.    I basically looked down and basically lined myself with the cone, stepped in, put my foot on the padeye, and I twisted the cone off, the lock off.

Q.    Okay.  And after you stepped on the padeye, you got your left foot on the padeye?

A.    Yes.

Q.    And your right foot is on the grate?

A.    Yes.

Exh. D, attached to SCS, at p. 60:15-25.

Q.    So can you explain to me how your left foot got into the hole?

11

A.    No, I can't.

Q.    Did you sense that you had lost balance before your left foot went into the hole?

A.    No.  It felt like I slipped off the padeye.

Exh. D, attached to SCS, at p. 66:1-6.

**B.    Material Facts**

 **1.    The lighting was adequate.**

 During his deposition, Meyer testified as follows:

Q.    And so this is something you discussed with [Dan Farney] before you got to row 15?

A.    Yes.

Q.    Had you already been through the row?

A.    No. <u>You can see it on the deck when you're walking up to it before you get there.</u>

Exh. D, attached to SCS, at p. 57:8-13 (emphasis added).  Meyer has also testified that sufficient natural and artificial lighting was present to see the general area as well as the specific "dangerous" conditions in question.  He testified the weather was "clear" (Exh. D, attached to SCS, at p. 42:8-10); there were lights where the pens were located (*see* Exh. D, attached to SCS, at pp. 42:25-43:2); the sun had not set yet (*see* Exh. D, attached to SCS, at p. 51:4-13); he had no problems seeing the grate (*see* Exh. D, attached to SCS, at p. 53:7-9); he could see the padeye in question (*see* Exh. D, attached to SCS, at p. 53:10-11); and there was enough light

12

at the time to see the padeye in question.  *See* Exh. D, attached to SCS, at p. 83:19-

22.

      2.      **Matson Navigation had no knowledge of or in the exercise of reasonable care had no reason to know of the hazards alleged by Meyer and, therefore, had no duty to correct or to warn of the alleged hazards.**

          a.      **Matson Navigation had no knowledge that the opening between the hatch cover and the catwalk was a safety hazard.**

     Meyer contends that the opening between the hatch cover and the

catwalk was a safety hazard.  As noted by our expert, Captain John Lawrence

Bergin, "it is common for container vessels that have expanded metal catwalks to

have some gap between the hatch cover and the catwalk . . . to give the crane

driver some leeway in landing the very heavy and awkward hatch covers into

place.  Exh. E, attached to SCS, at p. 3 (paragraph 5).

     There is no evidence that Matson Navigation considered the opening

in question to be a safety hazard.  Matson's Director of Safety, Quality &

Environmental Affairs, Paul Londynsky, had no knowledge of any safety concerns

regarding the openings between the hatch covers and the catwalks.  *See* SCS, at 4;

Exh. F, attached to SCS, at pp. 22:21-23:5, 30:2-18.  Matson's Director of Vessel

Engineering, Henry Olson, who is often called upon to design and make

modifications to ships, also is unaware of any concerns regarding the gaps.  *See*

13

SCS, at 4; Exh. G, attached to SCS, at p. 27:11-16. Thus, there is no evidence Matson Navigation had any knowledge of a dangerous condition relating to the opening in question.

        **b.**    **A pre-start cargo inspection was performed and no safety hazards were noted.**

The Matson Terminals, Inc. Vessel Safety Inspection Report (otherwise known as the "Pre-Start Inspection" Report) prepared on October 1, 2002 conclusively establishes that, in the view of Matson Navigation and Matson Terminals, there were no safety hazards to cargo operations that existed prior to cargo operations on October 1, 2002. Exh. 1, attached to Declaration of John Robinette, attached to SCS; SCS, at ¶5.

        **c.**    **Meyer had notice of the alleged dangerous conditions in question.**

        **(1)**    **Meyer had prior knowledge of vessel and carriage of livestock on vessel**

Meyer had prior experience on the *Lihue* and knew it would be carrying livestock. During his deposition, Meyer testified:

Q.    Had you ever worked in the area between rows 15 and 16 on the Lihue prior to the date of the accident.

A.    Yes.

              * * *

> Q.    If I was to ask you if it was <u>more or less than ten</u>
> <u>times</u>, would you be able to answer that?
>
> A.    <u>Yes</u>.
>
> Q.    And what would be your answer?
>
> A.    More.

Exh. D, attached to SCS, at p. 20:2-5, 20:10-14 (emphasis added).  He had prior

knowledge pigs were shipped aboard the vessel:

> Q.    Had you worked on the Lihue on prior occasions
> when there had been container pens of pigs being
> shipped?
>
> A.    Yes.
>
>                    * * *
>
> Q.    <u>More than ten</u>?
>
> A.    <u>I believe so</u>.
>
> Q.    Were there pig containers on both of the in-bound
> voyages?
>
> A.    Livestock, yes.
>
> Q.    And were those livestock containers normally in
> row 16?
>
> A.    Yes.

Exh. D, attached to SCS, at pp. 21:15-18; 21:21-22:3 (emphasis added).

### (2)    Meyer had prior knowledge of animal feces.

Meyer knew animal feces was present on the deck prior to beginning his work.

Q.    Now, was there any kind of foreign substance on the grate?

A.    Yes.

Q.    And what?

A.    I believe it was animals' urine and feces <u>all over everything</u>.  There was some slime and some solid waster here and there.

Q.    Now had you seen the feces on the grate?

A.    Yes.

Q.    And where did you see the feces?

A.    <u>It was on the grate, the hatch cover</u>.

Q.    Okay.  And you're talking about the grate where?

A.    The catwalk.

Q.    Okay.  So was it all along the catwalk on row 15?

A.    <u>The slime is everywhere</u>.  There's solid waste here and there.

Exh. D, attached to SCS, at p. 54:5-22 (emphasis added).

Q.    Did you actually see clumps of feces on the grate?

A.    When I got up there, <u>I did</u>.

Q.    And I assume when you see it, you try to step around it?

16

A.    Yes.

Exh. D, attached to SCS, at p. 58:1-6.

Q.    At any time that evening before the accident, had you ever walked under the grating?

A.    Yes.

Q.    And do you recall anything <u>dripping off of the grating</u>?

A.    <u>Yes</u>.

Q.    Like feces or urine?

A.    Yes.

Q.    And what do you recall?

A.    <u>It was just dripping all over.  I mean, I was getting dripped on</u>.

\* \* \*

Q.    So as you were walking under the grating between rows 15 and 16, you actually had liquid substance drip down on to your clothes?

A.    Yes.

Q.    And how were you able to tell that it was feces?

A.    The smell.

Exh. D, attached to SCS, at p. 76:3-77:4.

Q.    In connection with this material that was <u>dripping on you</u>, would you consider it to be a <u>safety hazard</u>?

A.    <u>Yes</u>.

Exh. D, attached to SCS, at p. 78:14-17.  Yet, despite Meyer's knowledge of

animal feces and urine in the area of the accident, he concedes that he did not ask

the animal tender to clean the area.  Exh. D, attached to SCS, at p. 58:8-9.

> **(3)     Meyer had prior knowledge of possibility of slippage from animal feces.**

Meyer also knew that he could slip on animal feces that was present

on the deck.

Q.     Had you ever fallen on the slime feces before?

A.     <u>Yes</u>.

* * *

Q.     Had you fallen on any of the metal grates on any of the
ships because of slime or feces?

A.     <u>Yes</u>.

Exh. D, attached to SCS, at p. 60:1-5; 60:10-12 (emphasis added).

> **(4)     Meyer had prior knowledge that placing his foot on the padeye was unsafe.**

Prior to slipping on the padeye, Meyer already knew that it was not

safe for him to use the padeye for leverage.

Q.     Did you ever feel your foot move on the padeye at
any time while you were trying to untwist the cone?

A.     <u>A little.  It rocked</u>.

* * *

Q.     Try to describe for me as best you can what you recall your foot doing on the padeye as you were twisting to get the cones?

A.     I felt it wobble.

Q.     It wobbled.  Is this back moving forward?

A.     Yes, backward and forward.

Q.     And did it actually feel like your foot was slipping?

A.     I would say yes with a wobble, yes.

Exh. D, attached to SCS, at pp. 85:17-86:9 (emphasis added).

> **(5)     Meyer had prior knowledge of an opening on the hatch cover in question.**

Meyer had seen the opening between the hatch cover and the catwalk

prior to the accident.

Q.     In connection with your work on the Lihue, prior to the night of this accident, you had worked in this area before?

A.     Yes.

Q.     Okay.  And is it correct that you knew that this opening in the deck as depicted here in photograph 2 was there on the vessel?

A.     I've noticed it.

Exh. D, attached to SCS, at p. 81:18-25.[6]

---

[6]     A copy of a photo of the open and obvious opening in the deck is attached for the convenience of the Court.  *See* Exh. H, attached to SCS.

III.  **ARGUMENT**

A.  **Standard of Review**

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party has the initial burden of "identifying for the court the portions of the materials on file [in the case] that it believes demonstrate the absence of any genuine issue of material fact." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)). If the moving party meets its burden, then the opposing party may not defeat a motion for summary judgment in the absence of any significant probative evidence tending to support its legal theory. *See Commodity Futures Trading Comm'n v. Savage*, 611 F.2d 270, 282 (9th Cir. 1979). The opposing party cannot stand on its pleadings, nor can it simply assert that it will be able to discredit the movant's evidence at trial. *See T.W. Elec. Serv.*, 809 F.2d at 630; Fed. R. Civ. P. 56(e). In considering a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party. *State Farm Fire & Casualty Co. v. Martin*, 872 F.2d 319, 320 (9th Cir. 1989).

**B.     Meyer misunderstands Matson Navigation's duties under the Longshore and Harbor Workers Compensation Act, 33 U.S.C. §901 et seq.**

The landmark case describing the duties of a shipowner to the stevedore and longshoreworkers is *Scindia Steam Navigation Co., Ltd. v. De Los Santos*, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981). *Scindia* stands for the proposition that a shipowner has a duty to (1) exercise ordinary care to have the ship and its equipment in a condition that an expert and experienced stevedore (or longshoreworker)[7] can carry on cargo operations with reasonable safety (i.e. turnover duty of safe condition) and (2) warn of any latent hazards that are known to the vessel or should be known to it in the exercise of reasonable care (i.e. turnover duty to warn).

**1.     The Scope of the Turnover Duty of Safe Condition**

In order to evaluate whether there is a turnover duty of safe condition, a court will consider whether the alleged hazardous condition was created by the cargo operations or was a condition inherent in the "ship and its equipment".

---

[7]     *See Thomas v. Newton International Enterprises*, 42 F.3d 1266, 1270 n. 4 (9th Cir. 1994) ("when examining whether a hazard was unreasonably dangerous, the focus of the factual inquiry is frequently directed at experienced longshore workers.").

a.     **The Law Regarding Unsafe Conditions Involving Cargo**

The turnover duty of safe condition clearly does not apply to unsafe conditions in the cargo stow.  In *Riggs v. Scindia Steam Navigation Co.*, 8 F.3d 1442 (9th Cir. 1993) ("*Riggs I*"), the Ninth Circuit considered whether a lower court properly granted summary judgment in favor of a shipowner in a lawsuit brought by a longshoreworker who was injured when he slipped on pipes that were open and obvious in the cargo hold.  The Ninth Circuit reversed and remanded the case, holding that "a vessel's turnover duty of safe condition extends to protecting against open and obvious cargo hazards."  *Id.* at 1449.

The Ninth Circuit's decision in *Riggs I* was subsequently appealed to the U.S. Supreme Court.  The Supreme Court vacated and remanded the case for further consideration in light of the Court's recent opinion in *Howlett v. Birkdale Shipping Co.*, 512 U.S. 92, 114 S.Ct. 2057, 129 L.Ed.2d 78 (1994).

In *Howlett*, the United States Supreme Court made it clear that the turnover duty to warn duty does not apply to open and obvious hazards.  The Supreme Court stated:

> The precise contours of the <u>duty to warn</u> of latent hazards in the cargo stow must be defined with due regard to the concurrent duties of the stevedore and to the statutory scheme as a whole.  It bears repeating that the duty attaches only to latent hazards, defined in this context as <u>hazards that would be</u>

> neither obvious to nor anticipated by a competent stevedore in
> the ordinary course of cargo operations. In addition, the
> vessel's duty to warn is confined to latent hazards that "are
> known to the vessel or should be known to it in the exercise of
> reasonable care." Absent actual knowledge of a hazard, then,
> the duty to warn may attach only if the exercise of reasonable
> care would place upon the shipowner an obligation to inspect
> for, or discover, the hazard's existence.

*Id.* at 99-100 (emphasis added).[8]

     *Howlett* stands for the proposition that a shipowner owes no duty of

safe condition or duty to warn for open and obvious conditions involving the cargo

operations. Thus, in light of the *Howlett* decision, on remand, the Ninth Circuit

Court of Appeals affirmed the lower court's decision in *Riggs I*, stating "consistent

with the *Howlett* decision, we now affirm the district court's grant of summary

judgment to the vessel." 35 F.3d 1466 (9th Cir. 1994) (emphasis added); *see also*

*Hayes v. Hoyu Venture Line S.A.*, 1998 AMC 2614, 2618 (D. Alaska 1998)

(holding turnover duty of safe condition does not extend to vessel's cargo); *Clay v.*

*Daiichi Shipping*, 74 F.Supp.2d 665, 671 (E.D. La. 1999) (acknowledging U.S.

Supreme Court and Ninth Circuit decisions for proposition that "the open and

obvious defense is applicable to the turnover duty to provide a safe vessel and that

a vessel owner has no legal duty to prevent or alleviate an unsafe condition in the

---

[8]    Importantly, the Supreme Court rejected the longshoreman's argument that "a
vessel must make reasonable inspections, both during and after stevedoring
operations" to discover defects in the stow". *Id.* at 100.

cargo hold resulting from an improper stow when the condition is open and obvious to longshore workers").

   b.    **The Law Regarding Unsafe Conditions Involving The Vessel and Its Equipment**

One might believe that motions for summary judgment on claims for longshoreworker injuries should in every case be denied based on the decision of the United States Circuit Court for the Ninth Circuit Meyer cites *Martinez v. Korea Shipping Corp.*, 903 F.2d 606 (9th Cir. 1990).  In *Martinez*, the the Ninth Circuit reviewed a claim from a longshoreworker who injured his back when he fell through an unguarded ladder opening on a lashing platform six feet above the deck.  The lower court granted summary judgment in favor of the shipowner; however, the Ninth Circuit reversed and remanded the decision on the basis that there was a material question of fact as to whether the unguarded ladder opening constituted an unreasonably dangerous condition to expert and experienced stevedores.  In so holding, the Court stated:

> Under *Scindia*, the obviousness of the defect does not absolve the vessel owner of its duty to turnover the ship in a condition under which expert and experienced [sic] stevedores can safely operate.

*Id*. at 610.  The most that can be said of *Martinez* is that the obviousness of the defect, alone, would not justify summary judgment under the circumstances of the

case. *See id.* at 610 ("we believe that reasonable jurors could differ on whether the ladder opening, although obvious, presented an unreasonably dangerous work environment to experienced longshoremen exercising reasonable care").

      *Martinez* does not stand for the proposition that summary judgment should be denied in every instance. *Martinez* also does not stand for the proposition that the fact that a defect is obvious is immaterial. This is established by the Ninth Circuit's opinion in *Bjaranson v. Botelho Shipping Corp.*, 873 F.2d 1204 (9th Cir. 1988).

      *Bjaranson* involved a longshoreworker who was injured when he was descending a "coaming ladder" and, when he reached for but was unable to find a hand hold, fell to the deck. Although a jury returned a verdict in the longshoreworker's favor, the shipowner moved for judgment notwithstanding the verdict and for a new trial, which was denied. On appeal, the Ninth Circuit reversed the lower court's denial of judgment notwithstanding the verdict. The Court explained:

> With respect to the turnover duty of safe condition, the Supreme Court in *Scindia* did not state unequivocally that the ship and its equipment must be in a safe condition. Rather, in preparing the ship for a cargo operation, the vessel must exercise ordinary care in light of the fact that the operation will be conducted by an "expert and experienced" stevedore. This implies that certain dangers that may be hazardous to unskilled

> persons need not be remedied by an expert and
> experienced stevedore could safely work around them.
>
> . . . . [A] shipowner may leave unremedied conditions
> that would otherwise be considered unreasonably
> dangerous to less skilled persons.

*Id.* at 1207-1208. As such, in asserting a breach of the turnover duty of safe

condition, a longshoreworker "must introduce evidence that a hazard was such that

an expert and experienced stevedore would not 'be able <u>by the exercise of</u>

<u>reasonable care</u> to carry on its cargo operations with reasonable safety to persons

and property.'" *Id.* at 1208 (emphasis added).

> **2.     There is no Turnover Duty to Warn that is applicable to
> this case.**

There simply is no turnover duty to warn where the hazard is open

and obvious. *See Howlett*, supra.

> **3.     Examples of the Application of *Scindia* turnover duties to
> slip-and-fall cases.**

Because Meyer alleges to have slipped on slime and animal feces on a

padeye, this case is a slip-and-fall case. Numerous courts have ruled in favor of

shipowners on slip-and-fall claims where the dangerous condition was known, or

should have been obvious to or anticipated by the injured longshoreworker.

In *Pimental v. Ltd Canadian Pacific Bul*, 965 F.2d 13 (5th Cir. 1992),

the United States Court of Appeals for the Fifth Circuit considered the case of a

injured longshoreworker who was descending from a crane to the main deck and

subsequently slipped and fell on oil and grease on the landing inside the housing

for the crane.  The Court affirmed the directed verdict in the shipowner's favor,

stating:

> In the instant case, the two crane operators who operated
> the crane the day of the accident and the day before testified
> that the oil and grease on the passageway were immediately
> obvious to them.  Evidence was also presented that during the
> unloading, the stevedore had a product on the dock that could
> quickly and easily be used to clean up the oil and grease.  Based
> on the evidence presented, a reasonable jury could find only
> that the hazard was open and obvious and that it could have
> been easily remedied by Pimental.  Therefore, Pimental did not
> present evidence that supports liability . . .

*Id.* at 16.

In *Pledger v. Phil Guilbeau Offshore, Inc.*, Civil Action No. 02-1796,

Section L(1), 2003 U.S. Dist. LEXIS 7416 (E.D. La. May 1, 2003), a

longshoreworker brought claims for injuries when he slipped on algae on the back

deck of a utility boat.  Deposition testimony established that the algae was clearly

visible and obvious to plaintiff's crew.  Summary judgment was granted on the

turnover duty claims due to the open and obvious nature of the algae.

In *Irvin v. United States Military Sealift Command*, Civil Action No.

01-2634, Section "C" (J), 2003 U.S. Dist. LEXIS 8453 (E.D. La. May 19, 2003), a

longshoreworker brought a claim against a shipowner for injuries when he slipped

and fell on a "big blob of grease" on a hatch cover. He argued the ship's crew was responsible for washing the area, but the stevedore never asked the ship's crew to wash down the area before starting cargo operations. The Court granted summary judgment on the claims. In connection with its holding, the Court stated:

> Here, the plaintiff can not prove liability under either prong of the turnover duty. Although proof is lacking as to when the grease appeared, assuming that it was a product of the crane, it can not be said that an expert and experienced contractor would not be able to carry on its operations in a safe manner <u>where the plaintiff knew of the recurring presence of grease in the area,</u> routinely resolved the problem in the past, and on this particular day chose to take a short cut through that area, and admitted he did not look where he was stepping.

*Id.* at 5 (emphasis added).

4.    **Examples of the Application of *Scindia* turnover duties to dangerous conditions arising from the design of the vessel and/or its equipment.**

In *Haines v. Honolulu Shipyard, Inc.*, 125 F.Supp.2d 1020 (D. Haw. 2000), a decision rendered by Chief Judge Gillmor, a ship repair worker brought a claim against the United States Government, as owner of a navy tugboat that was undergoing repairs. The ship repair worker claimed he was injured while working in one of the ship's ballast tanks and his injuries were due to the unsafe tank design and the Government's failure to warn him of the *unsafe design conditions of the tank*. The Court granted summary judgment in favor of the Government because

28

the ship repair worker failed to demonstrate that the ship repair worker "could not,

with the exercise of reasonable care, enter, exit, and work inside of the tank" and,

as to the turnover duty to warn, the "allegedly dangerous structural conditions of

the tank were obvious to Plaintiff." *Id*. at 1027-29.

In *Burns v. D. Oltmann Maritime PTE Ltd.*, 901 F.Supp. 203 (E.D.Va.

1995), a longshoreworker's wife brought a claim against a shipowner, charterer

and manager of a vessel for fatal injuries caused to her husband when he lost

control of a lashing rod and was pulled over the side of the vessel onto the pier.

Plaintiff alleged the accident was caused by the *height of the guardrail* and the

*semi-automatic twist locks used for containers* on the vessel.  The Court granted

summary judgment in favor of the shipowner, stating:

> In this case, the height of the guardrail on the lashing
> platform and the use of semi-automatic twistlocks do not
> constitute hidden dangers.  Ceres knew that these twistlocks
> were used by the *M/V Neptune Jade* at the time stevedoring
> operations commenced on the date of the accident.  The use of
> twistlocks was an open and obvious condition on board the *M/V
> Neptune Jade*.  Under the Fourth Circuit opinions, the
> defendants were entitled to rely on the judgment of Ceres to
> continue stevedoring operations.  The defendants did not breach
> their turnover duties.

*Id*. at 207.

As a matter of law, Meyer cannot prevail at trial on either of the two

turnover duties -- turnover duty of safe condition or turnover duty to warn.  Matson

Navigation exercised "ordinary care" to make sure the ship was reasonably safe for cargo operations performed by an expert and experienced longshoreworker. Meyer could have safely performed his work if he had acted as an expert and experienced longshoreworker, and he did not do this. As to the turnover duty to warn, *Howlett*, supra, makes clear that since the opening in question and the animal feces were ***open and obvious*** conditions, Matson Navigation owed no duty to warn. Therefore, as a matter of law, Matson Navigation could not have breached its turnover duties to Meyer and summary judgment must be granted in its favor.

IV.    **CONCLUSION**

For the foregoing reasons, Matson Navigation respectfully requests the Court to grant summary judgment in its favor.

DATED: Honolulu, Hawaii, January 9, 2006.

/s/ Randolf L.M. Baldemor
JOHN R. LACY
RANDOLF L.M. BALDEMOR

Attorneys for Defendant
MATSON NAVIGATION COMPANY,
INC.