1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF HAWAII

3

4   BERT MEYER,                )CIVIL NO. 04-00049 HG/BMK
                               )(In Admiralty)
5              Plaintiff,      )
                               )
6        vs.                   )
                               )
7   MATSON NAVIGATION COMPANY, )
    INC.,                      )
8                              )
               Defendant.      )
9   _____)

10

11              DEPOSITION OF BERT MEYER

12  Taken on behalf of the Defendant MATSON NAVIGATION

13  COMPANY, INC., at the law offices of Goodsill,

14  Anderson, Quinn & Stifel, 1099 Alakea Street, 1800

15  Ali'i Place, Honolulu, Hawaii 96813, commencing at

16  9:50 a.m., on Tuesday, August 31, 2004, pursuant to

17  Notice.

18

19       BEFORE:  MYRLA R. SEGAWA, CSR No. 397

20       Notary Public, State of Hawaii

21

22

23

24                                    EXHIBIT "D"

25

13

1    reports before?

2        A    Yes.

3        Q    On how many occasions?

4        A    One.

5        Q    And what kind of an accident were you

6    involved in previously?

7        A    I had my thumb jammed in a doorjamb of a

8    car.

9        Q    And did you lose any time from work?

10       A    No.

11       Q    Before preparing this report on October 1,

12   2002, did you discuss what was to be included in the

13   report with anyone?

14       A    No.

15       Q    Under about two-thirds of the middle of the

16   page, it says witnesses to accident.  You have none?

17       A    Yes.

18       Q    Is that correct?

19       A    Yes.

20       Q    So to your knowledge no one saw what

21   happened?

22       A    Yes.

23       Q    Let me ask you differently.  Did anyone see

24   the accident happen?

25       A    No.

18

1      A      I don't understand the question.

2      Q      What were you told about watching where you

3  were walking when you were on the vessels?

4      A      Just watch where you put your feet.

5      Q      And who told you that?

6      A      At the time it was Ray Suganuma.

7      Q      And who was he?

8      A      He was a safety director when I was hired.

9      Q      This was at McCabe?

10     A      Yes.

11     Q      And following his instructions, what was

12  your normal habit as far as watching where you were

13  walking?

14     A      Just watch where I put my feet.

15     Q      So I guess you would agree that it's

16  prudent to watch where you're walking when you're on

17  one of the vessels?

18     A      Yes.

19     Q      In connection with watching where you put

20  your feet, were there any particular hazards that you

21  would watch for on the Lihue?

22     A      Open grates.

23     Q      When you say grates, what are you referring

24  to?

25     A      The movable catwalks that could be removed.

20

1    A    No, we don't know our assignments.

2    Q    Had you ever worked in the area between

3 rows 15 and 16 on the Lihue prior to the date of the

4 accident?

5    A    Yes.

6    Q    How many times?

7    A    I don't know.

8    Q    Do you have any estimate?

9    A    I wouldn't be able to estimate.

10    Q    If I was to ask you if it was more or less

11 than ten times, would you be able to answer that?

12    A    Yes.

13    Q    And what would be your answer?

14    A    More.

15    Q    More than 50?

16    A    I wouldn't know.

17    Q    In connection with working on the Lihue, if

18 you identified a grate that was not in place for

19 instance, what was the procedure that you were

20 supposed to follow?

21    A    Don't fall in.

22    Q    Were you to report it to anyone or were you

23 to --

24    A    No.

25    Q    Were you to take any corrective action?

21

1       A     No.

2       Q     If the grate was open, would it create a

3  hazard for one of your fellow longshoremen that was

4  on the vessel?

5       A     I don't know.

6       Q     Did you ever warn any of your fellow crew

7  members about opening the grates on the Lihue?

8       A     If I was working with someone, I would.

9       Q     Assuming you weren't working with someone

10 and you discovered a grate that was not in place,

11 would you do nothing then?

12      A     No.

13      Q     What would you do?

14      A     Put it back in place.

15      Q     Had you worked on the Lihue on prior

16 occasions when there had been container pens of pigs

17 being shipped?

18      A     Yes.

19      Q     Do you have an estimate how many times?

20      A     I don't know.

21      Q     More than ten?

22      A     I believe so.

23      Q     Were there pig containers on both of the

24 in-bound voyages?

25      A     Livestock, yes.

22

1       Q    And were those livestock containers

2  normally in row 16?

3       A    Yes.

4       Q    On October 1, 2002, at the time of your

5  accident, were there livestock pens on the Lihue?

6       A    Yes.

7       Q    Do you recall how many?

8       A    No, I don't.

9       Q    Do you recall who the owners of the pens

10  were?

11       A    No, I don't.

12       Q    Are you able to describe the appearance of

13  the containers that were on the Lihue that night?

14       A    What do you mean by appearance?

15       Q    Well, in other words, size, any markings,

16  that type of thing?

17       A    No.

18       Q    Did they appear to be similar to a 40-foot

19  container?

20       A    I believe they're longer.

21       Q    Did they have any openings on the sides?

22       A    Yes, yes.

23       Q    Now, I'm talking about on the night of your

24  accident?

25       A    Yes.

25

1      Q     So this would have been shortly after the

2   accident?

3      A     Yes.

4      Q     Did you have any other discussion with him?

5      A     No.

6      Q     Had you ever seen this particular tender

7   before that night?

8      A     No.

9      Q     Did you discuss the accident with any other

10  tenders?

11     A     No.

12     Q     Do you know how many tenders were on duty

13  that night?

14     A     No, I don't.

15     Q     Had any of the container pens with

16  livestock been discharged before your accident?

17     A     No.

18     Q     Were there other longshoremen who walked in

19  the area between rows 15 and 16 before you?

20     A     Yes.

21     Q     Do you know who?

22     A     No, I don't.

23     Q     They were from your gang?

24     A     No.  I wasn't part of the lashing gang.

25     Q     So you were on the lashing gang?

29

1    today, did you review any documents?

2         A    Yes.

3         Q    What documents did you review?

4         A    My recorded statement that I took with

5    Heidi Kahlbaum.

6         Q    This is with Heidi Kahlbaum?

7         A    Yes.

8         Q    Anything else?

9         A    No.

10        Q    Was there anything in the recorded

11   statement that you identified as being an error or

12   not accurate?

13        A    I don't recall.

14        Q    When did you review it?

15        A    Last night.

16        Q    And before last night, when did you last

17   review it?

18        A    When I received it, I can't recall when.

19        Q    Would it have been within the last month?

20        A    No.

21        Q    As a result of your review last evening, do

22   you recall anything in the statement that you felt

23   was not accurate?

24        A    Not that I can see.

25        Q    In connection with your review of

42

1     Q    So even if it's three high, you can

2  actually see it from standing down on the catwalk?

3     A    Usually.

4     Q    And on the evening of October 1, were you

5  able to see the cone locks as you were unlocking

6  them?

7     A    Yes.

8     Q    Do you recall what the weather was like

9  that evening?

10    A    It was clear.

11    Q    Had there been any mauka showers in the

12  area?

13    A    No, not that I know of.

14    Q    And had the crane started to work the

15  containers?

16    A    I'm not sure.

17    Q    So you would be working the aft containers?

18    A    Yes.

19    Q    Do you recall how many cranes were being

20  used that night on the Lihue?

21    A    I don't recall.

22    Q    Do you know where the cranes were located

23  at the time of your accident?

24    A    No, I don't.

25    Q    Were there any lights set up for the tender

43

1    areas where the pens were located?

2        A    I believe so.

3        Q    Do you recall what kind of lights?

4        A    No, I don't.

5        Q    Were they mobile lights or were they fixed?

6        A    I don't recall.

7        Q    Do you recall how many?

8        A    No.

9        Q    Now, focusing on the containers in row 15,

10   where did you start your process of unlocking the

11   cones?  Is it on the in-shore or the outside?

12       A    In-shore.

13       Q    So had you moved from in-shore all the way

14   across to the harbor side of the container row?

15       A    Yes.

16       Q    And you had unlocked all the cones?

17       A    Yes.

18       Q    Except for those that stuck?

19       A    Yes.

20       Q    And do you recall how many had stuck?

21       A    Two.

22       Q    Okay.  And where are they located?

23       A    One was in the middle and one was on the

24   in-shore.

25       Q    And do you know what had caused the one in

45

1      Q      No one else was assisting you?

2      A      No.

3      Q      Okay.  So after the one in the middle that

4  was stuck was released, then you moved to the

5  in-shore?

6      A      Yes.

7      Q      Was it the most in-shore container?

8      A      No.

9      Q      How many containers were more in-shore?

10     A      I don't recall.

11     Q      But you know there was at least one?

12     A      Yes.

13     Q      With the stack of containers that was more

14  in-shore, do you recall how high that stack was?

15     A      No, I don't.

16     Q      As you moved along the catwalk for row 15,

17  first of all, can you describe what the catwalk is

18  made out of?

19     A      Wire grates.

20     Q      And was it in place all the way across from

21  the in-shore to the harbor side of the roof?

22     A      There's one section missing.

23     Q      And where was that?

24     A      It was a quarter way in.  I can't say.

25     Q      A quarter way in from in-shore?

46

1      A    Maybe five cans in, six cans in.

2      Q    And when you say five or six cans, you're

3 talking about stacks of containers?

4      A    Containers, yes.

5      Q    About how many stacks of containers from

6 one side of the vessel to the other are there on row

7 15?

8      A    I can't recall.

9      Q    And do you know where that missing section

10 of the grate was?

11     A    No, I don't.

12     Q    But it was about five stacks in?

13     A    Yeah.

14          MR. EASLEY:  That's a yes?

15          THE WITNESS:  Yes, sorry.

16 BY MR. LACY:

17     Q    How did you discover it was missing?

18     A    It wasn't there when I got up on the

19 catwalk.

20     Q    So you actually looked and saw that it was

21 missing?

22     A    Yes.

23     Q    Do you recall about how large that missing

24 section was?

25     A    About three to four feet.

47

1    Q    Long?

2    A    Yes.

3    Q    Do you know where the section was?

4    A    No, I don't.

5    Q    Did you replace it?

6    A    There was nothing to replace it with.

7    Q    Did you look for something?

8    A    No.

9    Q    So how did you traverse that area?

10   A    Stepped over.

11   Q    Was there any other portion of the bar

12   grate on row 15 that was missing?

13   A    No.

14   Q    Was there any lashing rods or other pieces

15   of equipment laying on the grate?

16   A    Yes.

17   Q    What?

18   A    Buckles and rods.

19   Q    Were the lashing gangs supposed to remove

20   those?

21   A    After the containers were moved.

22   Q    So is it their normal practice to leave the

23   lashings and buckles on the grate after they've

24   removed them?

25   A    Yes.

48

1       Q   So when you walk along the area, then you

2  have to watch for the buckles and lashings?

3       A   They're either to the side.

4       Q   On that particular evening, did you observe

5  any that were not on the side?

6       A   No.

7       Q   So there was a clear walk path for you

8  along the grate?

9       A   Yes.

10      Q   And did you follow your normal practice of

11  watching where you were walking?

12      A   Yes.

13      Q   Now, at the containers on the in-shore side

14  that was stuck, do you recall how high that stack

15  was?

16      A   I believe it was the third container up.

17      Q   And so you had a pole that has a three-high

18  pole?

19      A   I call it the two-high pole.  It reaches

20  the top of the two high container.

21      Q   So you were able to reach it while standing

22  on a grate?

23      A   No.

24      Q   What do you have to do to reach it?

25      A   I have to get my body directly underneath

49

1    the can to put the pole as vertical as possible.

2         Q     Why?

3         A     So I could twist it to the side.

4         Q     And if you stand on the grate, can you

5    reach and twist the cone?

6         A     No.

7         Q     So then you needed to stand on what to get

8    as close to the can as possible?

9         A     I needed to get right up against the can so

10   I stood on a D-ring.

11              MR. EASLEY:  Are you sure it's a

12   D-ring?

13              THE WITNESS:  Padeye, sorry.

14   BY MR. LACY:

15        Q     Was that padeye painted with the yellow

16   reflective paint?

17        A     I don't recall.

18        Q     Had you stood on padeyes before the night

19   of the incident to twist cones that were stuck?

20        A     Yes.

21        Q     To stand on the padeye, was that necessary

22   to give you more elevation or was it just because

23   that was where you stepped?

24        A     That's where my foot had to be.  I had to

25   get right up in line with that cone.

50

1      Q    The padeye that you're referring to is

2  attached to the hatch cover?

3      A    Yes, sir.

4      Q    Can you stand on the hatch cover and reach

5  the cone that you need to twist without stepping on

6  the padeye?

7      A    Not at that time I couldn't.

8      Q    And why couldn't you?

9      A    Because I would have been more over.  The

10  padeye ended up right in line with the cone.

11      Q    And with the two-high pole if you use the

12  three-high pole instead, would you be able to stand

13  on the grate and do the same function?

14      A    No.

15      Q    Why not?

16      A    Because when you stand on the grate, you

17  can only pull down.  The cable will come out and get

18  tangled.

19      Q    What cable?

20      A    The cone there's a pin that you pull out

21  that's attached to a cable.  So the only way you can

22  really do it is to twist the cable straight.

23      Q    And have you tried to do it from the grate?

24      A    Yes, it wouldn't pull down.

25      Q    On the night of this accident, I'd ask you

51

1   a little earlier about the weather and you said you

2   didn't recall any showers?

3       A    No.

4       Q    What about the moon, do you recall what the

5   state of the moon was?

6       A    No, it wasn't out yet.  It wasn't out.  The

7   sun didn't set.

8       Q    Did you say the sun had not set?

9       A    I believe the moon wasn't out yet.

10      Q    Okay.  Let me make sure I understand that.

11  At the time of your accident, do you believe it was

12  still twilight?

13      A    Yes.

14      Q    Do you know if the sun had actually set?

15      A    No, I don't.

16      Q    Okay.  And do you know if the moon had

17  actually risen?

18      A    No, it didn't.

19      Q    It had not?

20      A    I'm assuming no, it didn't.

21      Q    And was there a superintendent that night

22  on the job?

23      A    Yes.

24      Q    And do you recall who that was?

25      A    Danny Farney.

53

1       A    No, I can't recall.

2       Q    I know you were telling me that the tenders

3  did have lights in the back.  Where were the lights

4  in relationship to the containers that were behind

5  you?

6       A    I don't recall.

7       Q    Did you have any problems in seeing the

8  grate?

9       A    No.

10       Q    Were you able to see the padeye?

11       A    Yes.

12       Q    Now, you were describing that you stepped

13  on a padeye in order to get as close as you could to

14  the container?

15       A    Yes.

16       Q    And which foot did you put on the padeye?

17       A    My left.

18       Q    And where was your right foot?

19       A    On the grate.

20       Q    So you kind of stepped forward?

21       A    Yes.

22       Q    Did you ever put all of your weight on your

23  left foot?

24       A    I don't recall.

25       Q    Did you ever bring your right foot up to

54

1    the top of the hatch cover?

2        A    No.

3        Q    Did it remain on the grate at all times?

4        A    Yes.

5        Q    Now, was there any kind of foreign

6    substance on the grate?

7        A    Yes.

8        Q    And what?

9        A    I believe it was the animals' urine and

10   feces all over everything.  There was some slime and

11   some solid waste here and there.

12       Q    Now, had you seen the feces on the grate?

13       A    Yes.

14       Q    And where did you see the feces?

15       A    It was on the grate, the hatch cover.

16       Q    Okay.  And you're talking about the grate

17   where?

18       A    The catwalk.

19       Q    Okay.  So was it all along the catwalk on

20   row 15?

21       A    The slime is everywhere.  There's solid

22   waste here and there.

23       Q    And when you refer to slime, what are you

24   referring to?

25       A    Just everything mixed together in a liquid

55

1    form.

2        Q    And do you know how it had got up to the

3    grate?

4        A    Well, the containers are right there and

5    they just swirl around in the air and then they do

6    tend to shoot out.  I mean, the animals are right up

7    against the opening of the containers.

8        Q    Were there openings in the containers that

9    were along the grate level?

10       A    Yes.

11       Q    On row 15?

12       A    Yes, I believe there was.

13       Q    Now, did you report seeing the slime in

14   some places the feces on the grate to anyone?

15       A    Yes.

16       Q    Who?

17       A    I complained about it to Danny Farney.

18       Q    And was this before or after the incident?

19       A    While we were walking up when we first got

20   up on the ship.

21       Q    I'm sorry?

22       A    When we first got up on the ship.

23       Q    So you told Danny Farney specifically that

24   there was feces and slime stuff on the grate?

25       A    Usually when a ship comes in, you know,

56

1    it's there and it's everywhere on the deck when

2    you're coming up there.

3         Q    Okay.  But particularly on this night of

4    October 1, do you recall specifically pointing it out

5    to Danny?

6         A    No, not pointing it out.  Just telling him.

7         Q    And what did you tell him?

8         A    That there's basically crap everywhere.

9         Q    And what did he say?

10        A    It's just a joke.  He laughed.

11        Q    Do you know anything about whether or not

12   the tenders wash down the area before the ship comes

13   in to the harbor?

14        A    It doesn't seem like they do.

15        Q    Have you ever talked with any of the

16   tenders about what is done about when the ship comes

17   into the harbor?

18        A    No, I don't.

19        Q    As you're walking on the grate that night,

20   did you lose your footing at any time before this

21   incident?

22        A    Not that I can recall.

23        Q    So when you told Danny about the slime and

24   feces, you say he laughed?

25        A    Yeah, everybody laughs who gets stuck in

57

1      the section with the pigs or any livestock.

2          Q      So that's a less desirable section of the

3      ship?

4          A      Yes.

5          Q      Other than him laughing, did he say or do

6      anything about the slime or feces?

7          A      No.

8          Q      And so this is something you discussed with

9      him before you got to row 15?

10         A      Yes.

11         Q      Had you already been through the row?

12         A      No.  You can see it on the deck when you're

13     walking up to it before you get there.

14         Q      When you say on the deck, what deck are you

15     referring to?

16         A      The deck of the ship.

17         Q      And this would be the deck where the first

18     stack of livestock containers are located?

19         A      On row 16, yes.

20         Q      That would be the main deck?

21         A      Yes.

22         Q      Now, you saw some slime and feces?

23         A      You saw clumps of feces on the ground.

24         Q      Okay.  This was on the main deck?

25         A      Yes.

58

1      Q      Did you actually see clumps of feces on the

2   grate?

3      A      When I got up there, I did.

4      Q      And I assume when you see it, you try to

5   step around it?

6      A      Yes.

7      Q      Did you ask the tender or anyone to clean

8   it?

9      A      No.

10     Q      Is there a Danny Kaneala?

11     A      That's Danny Farney.  Everybody calls him

12   Kaneala.

13     Q      With regard to the feces then, did you step

14   in any of the solid clumps of feces as you were

15   working on the grate?

16     A      Not that I was aware of.

17     Q      And with regard to the slime, can you

18   describe for me a little bit more what you mean by

19   that?

20     A      A slimy substance on everything from -- it

21   even comes off on the four high stack.  If you're on

22   the bottom doing cones, it's everywhere.  I guess

23   with the wind swirling, it's everywhere.  It's just a

24   gritty slimy thing on everything.

25     Q      So what kind of shoes do you wear when

60

1    A    Well, you just walk straight up.  I didn't

2  notice.

3    Q    Had you ever fallen on the slime feces

4  before?

5    A    Yes.

6    Q    On how many occasions?

7    A    I don't recall.

8    Q    Had you fallen on the Lihue before?

9    A    Not that I can remember.

10    Q    Had you fallen on any of the metal grates

11  on any of the ships because of slime or feces?

12    A    Yes.

13    Q    Do you remember which ship?

14    A    Not offhand.

15    Q    So when you got to the in-shore container

16  that you needed to twist the lock, describe for me

17  exactly what you did?

18    A    I basically looked down and basically lined

19  myself with the cone, stepped in, put my foot on the

20  padeye, and I twisted the cone off, the lock off.

21    Q    Okay.  And after you stepped on the padeye,

22  you got your left foot on the padeye?

23    A    Yes.

24    Q    And your right foot is on the grate?

25    A    Yes.

66

1    Q    So can you explain to me how your left foot

2    got into the hole?

3    A    No, I can't.

4    Q    Did you sense that you had lost balance

5    before your left foot went into the hole?

6    A    No.  It felt like I slipped off the padeye.

7    Q    Describe for me what you mean slipped off

8    the padeye?

9    A    I guess my momentum of my body went one way

10   and my left foot stayed one way.

11   Q    Have you ever had trouble with dizziness?

12   A    Not dizziness.

13   Q    Have you had any problems with stability

14   getting off out of balance?

15   A    No.

16   Q    Ever have any inner ear problems or

17   anything that would explain why you would lose your

18   balance?

19   A    No.

20   Q    So do you recall specifically feeling like

21   you lost your balance at any time before your foot

22   went into the hole?

23   A    Not that I can recall.

24   Q    Did you look at the padeye at all before

25   you stepped on it?

76

1    that grating on the deck level; is that correct?

2         A    Yes.

3         Q    At any time that evening before the

4    accident, had you ever walked under the grating?

5         A    Yes.

6         Q    And do you recall anything dripping off of

7    the grating?

8         A    Yes.

9         Q    Like feces or urine?

10        A    Yes.

11        Q    And what do you recall?

12        A    It was just dripping all over.  I mean, I

13   was getting dripped on.

14        Q    Did you walk under the grate with anyone

15   else?

16        A    No.

17        Q    Do you recall approximately when it was

18   that you walked under the grate in comparison to when

19   the accident happened?

20        A    No, I don't.

21        Q    It had to be within an hour, correct?

22        A    Yes, yes.

23        Q    So as you were walking under the grating

24   between rows 15 and 16, you actually had liquid

25   substance drip down on to your clothes?

77

1      A      Yes.

2      Q      And how were you able to tell that it was

3  feces?

4      A      The smell.

5      Q      Well, is there generally a smell in that

6  area while the pens are on the ship?

7      A      Yes.

8      Q      So even if there was nothing on the deck,

9  you would still have that smell, would you not?

10     A      Yes.

11     Q      So when you say by the smell, how do you

12  distinguish the smell that's usually there with the

13  pens versus some things dripping off the grate?

14     A      I put my clothes to my nose, and I sniffed

15  it.

16     Q      So you actually smelled some of the liquid?

17     A      Yes.

18     Q      To your knowledge, have any of the

19  longshoremen ever refused to work in the area because

20  it was dirty because of feces or urine?

21     A      No.

22     Q      Did you ever -- I don't want to use the

23  word threaten -- did you ever tell anyone from Matson

24  Terminals that you wouldn't work in the area until it

25  was cleaned up?

78

1    A    No.

2    Q    Did you consider doing that?

3    A    No, because I thought I would be written

4 up.

5    Q    Written up for what?

6    A    Refusing to work.

7    Q    Did you talk to anyone at the union about

8 whether you had to work on those conditions?

9    A    No.

10    Q    What about someone at McCabe, did you speak

11 with anyone at McCabe if you had to work in those

12 conditions?

13    A    Not that I can recall.

14    Q    In connection with this material that was

15 dripping on you, would you consider it to be a safety

16 hazard?

17    A    Yes.

18    Q    And had you learned from your work with the

19 other longshoremen that if there was a safety hazard

20 that you did not have to work in the area that you

21 could, in fact, hold off working until it was

22 corrected?

23    A    No, I wasn't aware.  Could you define

24 safety as I'm talking about health like I'm always

25 worried about the feces getting on me and getting

79

1    sick from that, not getting injured.  That's my

2    concern.

3         Q    Well, I think you told me earlier with your

4    shoes even with the rubber soles if the slimy stuff

5    from the pen is on the deck, it's slippery, correct?

6         A    Yes.

7         Q    And if it's a slippery deck, I would assume

8    you would consider that a hazardous condition?

9         A    Yes, okay.

10        Q    Now, there were some photographs that I

11   received, Mr. Meyer, that I'm going to show you here.

12   We'll mark this first photograph as Exhibit 2 for

13   identification.

14                  (Exhibit No. 2 was marked for

15                     identification.)

16   BY MR. LACY:

17        Q    Have you seen that photograph before?

18        A    Yes.

19        Q    Did you take this photograph?

20        A    I believe I did.

21        Q    Okay.  Do you remember what camera you used

22   to take it?

23        A    No, I don't.

24        Q    When did you take it?

25        A    I don't know the exact date.  It was after

81

1  removal or the installation of the hatch cover?

2       A    No, I don't.

3       Q    Is the opening that is depicted there

4  between the whitish frame and the metal grating is

5  that the hole where your left foot went into?

6       A    Yes.

7       Q    Now, at the time you took this photograph,

8  was this in the evening or daytime?

9       A    This was around -- it was at lunchtime.

10      Q    In the evening?

11      A    Yes.

12      Q    So this would have been?

13      A    About eleven o'clock at night.

14      Q    Eleven?

15      A    Yes.

16      Q    And did you use a flash?

17      A    Yes.

18      Q    In connection with your work on the Lihue,

19  prior to the night of this accident, you had worked

20  in this area before?

21      A    Yes.

22      Q    Okay.  And is it correct that you knew that

23  this opening in the deck as depicted here in

24  photograph 2 was there on the vessel?

25      A    I've noticed it.

83

1        Q    Or I should say the same evening?

2        A    Yes.

3        Q    And does this show a view from the grate

4    where you stand and look at first of all the padeye

5    and look towards the hole?

6        A    Yes.

7        Q    Is that a fair description?

8        A    I was on the catwalk looking.

9        Q    Does this photograph accurately depict the

10    way the area looked on the night of your accident?

11        A    Except for the bright paint I would say

12    yes.

13        Q    Okay.  Now what is it about the bright

14    paint?

15        A    I don't recall it being that bright.

16        Q    Well, do you recall there being yellow

17    paint on the padeye?

18        A    I don't think there was.

19        Q    How were you able to see the padeye to step

20    on it?

21        A    There was enough light at the time to look

22    down and see it.

23        Q    With regard to the padeye, then, at the

24    time of your accident, did it have any paint on it to

25    the best of your recollection?

85

1    and there, but there were noticeable piles.

2        Q    And was the grating itself looks like

3    there's kind of rust on the grating?

4        A    I believe there was rust also there.

5        Q    In connection with the padeye that you said

6    that your left foot was on, I assume it's the padeye

7    that's looking at the photograph, kind of in the

8    center of the photograph?

9        A    Yes.

10       Q    Would you just put a P on that?

11       A    (Witness complies.)

12       Q    So you've marked it with a P.  Do you

13   remember which portion of your foot, left foot was on

14   the padeye, was it the sole or the heel of your shoe?

15       A    I believe it was the ball, the arch of my

16   foot.

17       Q    Did you ever feel your foot move on the

18   padeye at any time while you were trying to untwist

19   the cone?

20       A    A little.  It rocked.

21       Q    Okay.  When you say it rocked, was that

22   because you were shifting your weight or was that

23   because the foot was moving on the padeye itself?

24       A    I couldn't tell you because I wasn't

25   looking at my feet.

86

1      Q    Try to describe for me as best you can what

2  you recall your foot doing on the padeye as you were

3  twisting to get the cones?

4      A    I felt it wobble.

5      Q    It wobbled.  Is this back moving forward?

6      A    Yes, backward and forward.

7      Q    And did it actually feel like your foot was

8  slipping?

9      A    I would say yes with a wobble, yes.

10     Q    I mean, you could feel the foot move back

11  and forth across the top of the padeye?

12     A    Yes.

13     Q    Did you ever think that your foot might

14  slip off the padeye?

15     A    No.

16     Q    Why not?

17     A    I thought I didn't have grip there.  I

18  didn't think I was slipping at the time.

19     Q    Okay.  Do you know whether prior to

20  stepping on the padeye you had walked through any of

21  the feces that you've marked with an X on the

22  grating?

23     A    I don't believe I did.

24     Q    Okay.  Had you stepped in any of the feces

25  that are on the hatch cover that you marked with an

102

1       Q       Did your right foot, any portion ever go

2   into that gap between the grating and the hatch

3   cover?

4       A       No.

5       Q       So as you're standing there, you get the

6   cone released and you're pushing up to release the

7   pole from the wire and the cone?

8       A       Yes.

9       Q       And is that when the accident happened?

10      A       Yes.

11      Q       Describe for me as best you recall what

12  happened at that point?

13      A       I remember getting the pole out and next

14  thing I slid in the hole.

15      Q       Did you actually feel your foot slide?

16      A       Yes, I think I did.  I just felt my body go

17  one way.

18      Q       Okay.  And I appreciate what you've said

19  about your body going one way.  I'm focusing on the

20  foot.  Did you actually feel your foot slip or slide

21  on the padeye?

22      A       I believe I did.

23      Q       And can you describe for me what position

24  your foot was in when you felt it start to slide?

25      A       I believe my toes were facing the

103

1  container.

2      Q    So your foot started sliding sideways?

3      A    Yes.

4      Q    Did you ever feel your left foot slide off

5  of the padeye?

6      A    Not to my recollection.  I just felt a

7  hole.  I went down.

8      Q    So did you ever feel your left foot come in

9  contact with any part of the hatch cover before it

10  went into the hole?

11     A    Not that I can recall.

12     Q    Did you feel your left foot come in contact

13  with the grate that's adjacent to the hole?

14     A    I don't think so.

15     Q    Did you ever feel your right foot slip or

16  slide?

17     A    No.

18     Q    Did you twist your ankle on the left foot?

19     A    I don't know.  I don't think I did.

20     Q    When you slid into the hole, were you still

21  standing upright or had you changed your body

22  position so that you were in a bent over position?

23     A    I believe I was still upright until I hit

24  the deck and then I bent over.

25     Q    When you say you hit the deck, what do you

106

1    it was just above the knee?

2         A    Oh, the inner, on the inside.

3         Q    Did you notice any other bruising?

4         A    No.

5         Q    After this accident, did you happen to

6    preserve any of your clothes or shoes that you were

7    wearing at the time?

8         A    I still have them at home.

9         Q    When I said preserve, I meant try to keep

10   them in the condition that they were in the time of

11   the accident?

12        A    No, sir.

13        Q    Did you ever have any photographs taken of

14   them?

15        A    No.

16        Q    When was it after the accident that you

17   first had a chance to look at your shoes?

18        A    The next day.

19        Q    And did you notice anything unusual about

20   your shoes the next day?

21        A    No.

22        Q    Now, after your foot went into the hole,

23   you said Danny helped you get out?

24        A    Yes.

25        Q    And then you went down to the break room?

139

1                    C E R T I F I C A T E

2    STATE OF HAWAII              )
                                  )  SS:
3    CITY AND COUNTY OF HONOLULU )

4            I, MYRLA R. SEGAWA, Notary Public, State of

5    Hawaii, do hereby certify:

6            That on Tuesday, August 31, 2004, at

7    9:50 a.m., appeared before me BERT MEYER, the witness

8    whose deposition is contained herein; that prior to

9    being examined he was by me duly sworn;

10           That the deposition was taken down by me in

11   machine shorthand and was thereafter reduced to

12   typewriting under my supervision; that the foregoing

13   represents, to the best of my ability, a true and

14   correct transcript of the proceedings had in the

15   foregoing matter.

16           I further certify that I am not an attorney

17   for any of the parties hereto, nor in any way

18   concerned with the cause.

19           DATED this 13th day of September, 2004, in

20   Honolulu, Hawaii.

21

22

23    _____
       MYRLA R. SEGAWA, CSR NO. 397
24     Notary Public, State of Hawaii
       My Commission Exp:  1-27-2005

25

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, HI (808) 524-2090