ORIGINAL

PRESTON EASLEY, ESQ./Cal State Bar No. 108347
LAW OFFICES OF PRESTON EASLEY
2500 Via Cabrillo Marina, Suite 106
San Pedro, California 90731-7724
Telephone: (310) 832-5315
Facsimile:   (310) 832-7730

ATTORNEY FOR: Plaintiff
                BERT MEYER

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

JAN 17 2006

at 4 o'clock and 2 min. __M
SUE BEITIA, CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| BERT MEYER, ) <br> ) <br> Plaintiff, ) <br> v. ) <br> ) <br> MATSON NAVIGATION ) <br> COMPANY, INC., and ) <br> PACIFIC LIVESTOCK, INC., ) <br> ) <br> Defendants. ) <br> ) | Civil No.: 04-00049 JMS-BMK <br> (In Admiralty) <br><br> DECLARATION OF CAPT. <br> ROBERT E. RILEY RE MOTION <br> FOR SUMMARY JUDGMENT |

I, Robert Riley, declare:

1. I have been retained as a stevedoring and vessel safety expert by plaintiff Bert Meyer in the above-referenced case. I could and would testify competently to the facts set forth herein.

1

2. I have a B.S. in nautical science from the Massachusetts Maritime Academy.

3. From 1972 to 1990 I worked for Marine Terminals Corp., a major stevedoring company. I was a corporate vice president at the time I left. I became corporate general manager in 1983 with responsibility for managing the company's stevedoring and marine terminal operations in Northern California. I was the assistant Pacific Coast operations manager for States Marine – Isthmian agency where I had responsibility for the operation of 25 trade vessels. From 1958 to 1967 I was a licensed deck officer on combination break-bulk container vessels and I served in all capacities, including Master. A true copy of my CV is attached hereto as exhibit 1 and incorporated by reference. My duties as a merchant marine officer and stevedoring company executive included making sure that vessels were safe for longshoremen. I am familiar with vessel safety requirements for an expert and experienced longshoreman. I am familiar with stevedoring operations on container ships.

4. During my entire 18 years at Marine Terminals Corp. I dealt extensively with the **Pacific Coast Marine Safety Code** and the longshoremen's collective bargaining agreement. I am familiar with the use and application of the **Pacific Coast Marine Safety Code** and I am aware

that its use is mandated by the union contract. My interpretation of the **Pacific Coast Marine Safety Code** is based on my own personal knowledge and experience. During my career in the stevedoring industry the **Pacific Coast Marine Safety Code** was literally the bible for stevedoring safety. Use of the **Pacific Coast Marine Safety Code** is mandated by the longshore collective bargaining agreement for the West Coast of the United States. It is the definitive standard for stevedoring safety on the West Coast.

5. I conducted an inspection of plaintiff's accident site aboard the S/S LIHUE on July 8, 2004.

6. While using a pole to unlock container cones above his head on the Matson Navigation vessel LIHUE on October 1, 2002, longshoreman Bert Meyer was injured when he fell through a gap between the inshore side of the hatchcover and the lashing platform between rows 15 and 16. The gap was 7 3/8" wide and 19 ½" long. His right foot was on the catwalk and his left foot was on the padeye on the hatchcover. Both the hatchcover and the catwalk were slick with animal waste, which was a cause of the accident. Meyer's left foot slipped off the padeye and his left leg went into the gap. He was stuck in the gap and injured his left hip. Both the gap and the animal waste created an unreasonably dangerous condition for an expert and experienced longshoreman. The vessel's crew (Matson Navigation

Company, Inc.) should have ensured that the animal waste was cleaned up before the longshoremen came aboard. The vessel owner should have modified (extended) the lashing platform to eliminate the gap. I have reviewed a photograph of a similar configuration on the vessel M/V SANDRA BLANCA, which is attached hereto as exhibit 6, and there is a minimal gap, which is consistent with industry practice. The gap on the LIHUE does not allow longshoremen to safely perform their work.

7. Exhibits 2 and 3 are photographs of Meyer's accident site aboard the S/S LIHUE. Note that next to Meyer's accident site there is a hinged piece of grating on the lashing platform above the fixed vertical ladder which allows longshoremen to climb up to the platform. The hinged grating cover stays closed while the longshoremen are working so that they will not fall down through the ladder access opening. Matson should have provided the same level of fall protection for the gap that it provided for the ladder access opening. It should be noted that there is no gap alongside the catwalk grating on the level below Meyer's accident site.

8. If one goes to the port side (opposite side from accident) of the catwalk where Meyer was injured the gap was much narrower. See photograph attached here to as exhibit 4. Since the distance between the catwalk and the back of the hatchcover was measured and found to be 5 ½",

then it appears that the gap between the port side of the hatchcover and the platform grating is about 4", which, although still unsafe, is considerably narrower than the 7 3/8" gap through which Meyer fell on the starboard side. I have also reviewed another photograph of the port side gap on the same row on the LIHUE where Meyer fell which is attached hereto as exhibit 5.

9. Matson was in violation of Matson Navigation Company Safety and Pollution Manual, Section Number C-01-190, paragraphs 1.0 through 4.1 and 4.2.1 which read as follows:

> **1.0 Purpose**
>
> 1.1 To describe the procedures, guidelines and safety precautions to be used when working aloft.
>
> **2.0 Scope**
>
> 2.1 This applies to all Matson vessels.
>
> **3.0 Responsibility**
>
> 3.1 The Master, Chief Officer and Chief Engineer (working aloft in the engine room) are responsible for adherence to this procedure.

### 4.0 Procedure

4.1 Job to be Evacuated – if there is a risk of falling at least 3 feet while working or if the location presents a risk likely to cause serious injury, the job shall be evaluated for ways to protect personnel.

**Notes:**

1. A fall from a height that is less than 3 feet can cause a serious injury. Protective gear shall be worn if the prevailing circumstances and conditions require it.

2. Ladders inclined greater than 70 degrees shall be treated as vertical ladders.

**4.2 Guidelines** – A temporary guardrail shall be rigged from a line in an area where groups of personnel may work or where on worker may frequently traverse.

**4.2.1 Mark Openings** – *All openings into which personnel could inadvertently step shall be conspicuously marked and barricaded.* [emphasis added].

10. Matson was also in violation of **Matson Navigation Company Safety and Pollution Manual, number C-01-100, October 15, 1998, Special Safety Precautions**, which states:

**1.0 Purpose**

1.1 To describe special safety precautions to be followed when working on a vessel.

**2.0 Scope**

2.1 This applies to all Matson vessels.

**3.0 Responsibility**

3.1 The Master shall ensure that all Licensed Officers understand this procedure and ensure that those working under their supervision adhere to these practices.

**4.0 Procedure**

4.1 A proactive approach shall be used to prevent the slips, trips and falls which cause many injuries aboard vessels. Personnel shall correct the situation or post appropriate warnings for the following conditions:

1. Wet, oily or highly waxed/polished floors/decks.
2. Slippery conditions on deck.
3. Dark or poorly lit routes.

    4.1.1 **Main Deck Access During Foul Weather** – During foul weather no person shall be permitted on exposed main deck areas without the approval of the Master or unless they are properly equipped with safety gear, such as a lifejacket, a safety harness or a lifeline and are properly supervised. The Master shall delay access to the main deck until the vessel's course and/or speed have been properly adjusted to provide the safest possible conditions.

    4.1.2 **Wet or Oily Floors/Decks** – Remove any liquid spilled in a work area or any accessible area.

11. The conditions aboard the LIHUE were in violation of the ILWU-PMA **Pacific Coast Marine Safety Code**, Section 2, Duties of Vessels of all types, Rules 201 and 249, which state:

    **Rule 201.** The owners and/or operators of vessels shall provide safe ship's gear and equipment and a safe working place for all stevedoring operations on board ship.

> **Rule 249.** Manholes and other deck openings which are flush with the deck shall be barricaded by use of either covers or railings.

12. The conditions aboard the LIHUE were in violation of the **International Labour Office Code of Practice for Accident Prevention Aboard Ship At Sea and In Port**, paragraph 9.5.5 which states:

> 9.5.5 Any openings through which a person might fall should be fitted with secure guards or fencing of adequate design and construction.

13. Mr. Meyer was injured when he fell from a lashing platform which was an extension of the catwalk that ran between the containers from one side of the ship to the other. The longshoremen do lashing from the catwalks and platforms. This means that they are often looking up at the containers to unlock cones (like Mr. Meyer) or to install or remove heavy lashing rods that hold the containers to the deck. Longshoremen are doing heavy work in these lashing areas which become unreasonably dangerous when there are openings large enough for the longshoremen to step or fall through. While lashing and unlashing containers the longshoremen need a firm working surface where holes and ledges that could result in a fall are

covered or barricaded. I have recently been involved as an expert witness in two other cases where longshoremen were injured when they fell through openings in the catwalk, which is essentially what occurred in the Meyer case. In the Meyer case Matson Navigation Company, Inc. failed to turn the vessel over in a safe condition for an expert and experienced longshoreman, and the conditions faced by Meyer which caused his accident were unreasonably dangerous for an expert and experienced longshoreman.

14. Gaps such as the one that Meyer fell through are uncommon. The grating between hatchcovers is usually flush with the hatchcover. Elevated lashing platforms are usually protected by railways.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 13, 2006 at San Pedro, California.

_____
ROBERT E. RILEY