# CONDENSED TRANSCRIPT
# IN THE MATTER OF

## BERT MEYER
## vs.
## MATSON NAVIGATION COMPANY, INC.

### DEPOSITION OF KEAHI BIRCH

### CIVIL NO. 04-00049

### TAKEN: NOVEMBER 9, 2004

### REPORTED BY: LAURA SAVO, RPR, CSR

JAN FLOATE & ASSOCIATES
P.O. BOX 1821
KAILUA, HAWAII 96734
(808) 263-1149

EXHIBIT B

**Page 1**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

BERT MEYER,                ) CIVIL NO. CV 04-00049
                           )          HG-BMK
        Plaintiff,         ) (In Admiralty)
                           )
vs.                        )
                           )
MATSON NAVIGATION          )
COMPANY, INC.,             )
                           )
        Defendant.         )
_____)

DEPOSITION OF KEAHI BIRCH

Taken on behalf of the Plaintiff pursuant to Notice, on Tuesday, November 9, 2004, commencing at 8:55 a.m., at the Law Offices of Goodsill Anderson Quinn & Stifel, Alii Place, Suite 1800, 1099 Alakea Street, Honolulu, Hawaii 96813.

**Page 2**

APPEARANCES:

For Plaintiff:

   PRESTON EASLEY, ESQ.
   Law Offices of Preston Easley
   2500 Via Cabrillo Marina, Suite 106
   San Pedro, California  90731-7724
   (310) 832-5315

For Defendant:

   RANDOLPH L. BALDEMOR, ESQ.
   Goodsill Anderson Quinn & Stifel
   Alii Place, Suite 1800
   1099 Alakea Street
   Honolulu, Hawaii  96813
   (808) 547-5600

REPORTED BY:  Laura Savo, CSR No. 347
              Notary Public, State of Hawaii

-oOo-

**Page 3**

I N D E X

| EXAMINATION: | PAGE |
|---|---|
| By Mr. Easley | 4 |

EXHIBITS FOR IDENTIFICATION:

| | |
|---|---|
| Exhibit 1 | 30 |
| (1-page accident report marked received 10-2-02) | |
| Exhibit 2 | 30 |
| (1-page photocopy of photograph) | |

UNANSWERED QUESTIONS AS REQUESTED BY COUNSEL:

| PAGE | LINE |
|---|---|
| 31 | 4 |

**Page 4**

1  (Pursuant to Rule 14 of the Rules Governing Court
2  Reporting in Hawaii, the reporter's disclosure was
3  made and is attached hereto.)
4              KEAHI BIRCH,
5  having been called as a witness and being first
6  duly sworn to tell the truth, the whole truth and
7  nothing but the truth, was examined and testified
8  as follows:
9              EXAMINATION
10 BY MR. EASLEY:
11     Q   Would you state your name for the record,
12 please.
13     A   Excuse me.  My legal name is Joleeann
14 Keahi Birch, but I go by Keahi Birch at work.
15 That's what it says on my business card.
16     Q   Can you spell your first name.
17     A   Sure.  J-o-l --
18     Q   J-o-l --
19     A   -- e-e --
20     Q   -- e-e --
21     A   -- a-n-n.
22     Q   -- a-n-n.  And then Keahi is K-e-h --
23 K-e-a-h-i; right?
24     A   Yes.
25     Q   And then Birch, B-i-r-c-h?

**Page 5**

1  A  Yes.
2  Q  Okay. Have you ever had your deposition
3  taken before?
4  A  No.
5  Q  Okay. I'm going to tell you a little bit
6  about why we're here. My name is Preston Easley.
7  I'm an attorney. I represent a McCabe longshoreman
8  by the name of Bert Meyer in a lawsuit against
9  Matson Navigation Company, Inc., and that lawsuit
10 is arising out of an accident that he had on the
11 Lihue. I'm trying to figure out the date, but it
12 was approximately 10-1-02 that it happened, and I'm
13 going to be asking you some questions as part of
14 that lawsuit.
15     I'll give you kind of the one-two-three
16 how a deposition works. We're not in a court of
17 law, but you've been given an oath to tell the
18 truth. So your answers should be truthful. You
19 should testify today just the same way that you
20 would testify in a court of law, remembering that
21 whatever you say here today can be read into
22 evidence at the time of trial.
23     It's important that you answer in words,
24 not in gestures. If you intend to say "yes" or
25 "no," please say "yes" or "no" rather than a slang

**Page 6**

1  expression. The reason being we want to make sure
2  when this is transcribed and somebody comes along
3  and reads it, it's clear whether you've said "yes"
4  or whether you've said "no."
5      If I ask you a question that you don't
6  know the answer to, say that you don't know. Don't
7  guess or speculate on anything. I'm entitled to
8  your best estimate for things such as weights,
9  times, distances and measurements.
10     Do you have any medical condition that
11 would keep you from giving your best testimony
12 today?
13 A  No.
14 Q  Okay. What's your current home address?
15 A  1113 Kainui Drive, K-a-i-n-u-i, Kailua,
16 K-a-i-l-u-a, Hawaii 96734.
17 Q  Say it once more.
18 A  96734.
19 Q  What's your phone number there?
20 A  (808) 263-7613.
21 Q  And who's your current employer?
22 A  Matson Navigation Company.
23 Q  What's your job title there?
24 A  My current job title is manager,
25 Environmental Affairs Hawaii.

**Page 7**

1  Q  How long have you worked for Matson
2  Navigation?
3  A  Eleven years.
4  Q  How long have you held the current job
5  title?
6  A  The current job title, three months.
7  Q  What was your job title before that?
8  A  Before that it was manager, Safety and
9  Environmental Affairs Hawaii.
10 Q  How long did you hold that position?
11 A  Four years.
12 Q  How about before that?
13 A  I was a vessel planner.
14 Q  Okay.
15 A  That was for three years. I was a
16 project leader for Matson's continuous improvement
17 program. We call it Kulana.
18 Q  Okay. Any other jobs at Matson
19 Navigation?
20 A  And I was also a container freight
21 station supervisor.
22 Q  Anything else or is that it?
23 A  That's it.
24 Q  Okay. Now, that wasn't a lot of detail
25 in that question. You're now the manager of

**Page 8**

1  Environmental Affairs, and before you were the
2  manager of Safety and Environmental Affairs?
3  A  Yes.
4  Q  So I notice that the word "safety" has
5  now left your job title. What's the significance
6  of that? Does that mean that someone else is now
7  doing the safety end of it, or you're still doing
8  the safety end of it? What does it mean?
9      MR. BALDEMOR: Object to the extent it
10 calls for speculation or is outside her personal
11 knowledge.
12 Q  (By Mr. Easley) We'll do the best we can.
13 Go ahead.
14 A  The job that I was doing -- that I was
15 doing prior to just the environmental side has been
16 split off into another position. That position
17 we're in the process of hiring a manager of Safety
18 and Workers' Compensation.
19     MR. EASLEY: Okay. See, there was a
20 logical answer there, Randy.
21 Q  (By Mr. Easley) So you're going to hire a
22 manager of Safety and Workers' Compensation?
23 A  Uh-huh.
24 Q  Is that yes?
25 A  Yes. Sorry.

## Page 21

1     it. Also, it's leading, argumentative.
2    Q  (By Mr. Easley) You can go ahead and
3    answer.
4    A  I've referenced it looking for background
5    information.
6    Q  Did you ever discuss that Pacific Coast
7    Marine Safety Code with any other Matson Navigation
8    or Matson Terminals employees?
9       MR. BALDEMOR: Preston, can I get a
10  continuing objection --
11       MR. EASLEY: Sure.
12       MR. BALDEMOR: -- on foundation grounds?
13  Let me just state the objection.
14       MR. EASLEY: Sure. Go ahead.
15       MR. BALDEMOR: The objection is that the
16  line of questioning assumes that Ms. Birch is
17  required to be utilizing the Pacific Coast Marine
18  Safety Code in performance of her duties and is
19  further vague with regard to exactly what use
20  Ms. Birch would be using the Pacific Coast Marine
21  Safety Code. And, further, it lacks foundation to
22  the extent the questions assume that it is
23  applicable in this instance.
24       MR. EASLEY: We'll agree that that's a
25  continuing objection.

## Page 22

1    Q  (By Mr. Easley) Do you remember what my
2  question was?
3      (The following question was read:
4      "Question: Did you ever discuss that
5      Pacific Coast Marine Safety Code with
6      any other Matson Navigation or Matson
7      Terminals employees.")
8      THE WITNESS: Yes.
9    Q  (By Mr. Easley) Who?
10    A  Mark Woody, who was our manager of Safety
11  and Compliance.
12    Q  Matson Navigation person?
13    A  Yes.
14    Q  In what context did you discuss it with
15  him?
16    A  Like I said, just as a reference with
17  looking at issues that apply here in Honolulu to
18  see what other ports have done.
19    Q  Okay. Does he still work for Matson
20  Navigation?
21    A  No, not anymore.
22    Q  Did he ever tell you that you should use
23  that Pacific Coast Marine Safety Code in certain
24  situations in Hawaii?
25    A  No.

## Page 23

1    Q  In the safety position, did you have any
2  subordinates?
3    A  No.
4    Q  In the safety position, who was your
5  boss?
6    A  Paul Londynsky.
7    Q  I'm going to use some of my own
8  terminology here, but I think you'll get the idea.
9  If you were the safety person in Hawaii for Matson
10  Navigation, did Matson Terminals have a
11  corresponding safety person?
12    A  No.
13    Q  Do you know someone named Priscilla at
14  work?
15    A  Yes.
16    Q  What's her last name?
17    A  Grace.
18    Q  Do you know who her employer is?
19    A  Matson Navigation.
20    Q  Do you know what her job title is?
21    A  Human Resources assistant.
22    Q  Is she involved in the preparation of
23  accident reports?
24    A  No.
25    Q  To your knowledge, does she have any

## Page 24

1  duties regarding accidents or injuries at Matson
2  Navigation or Matson Terminals?
3    A  She files the LS-202's. I know that.
4    Q  For Navigation and Terminals or just one
5  company?
6    A  Both.
7    Q  What was her name before it was Priscilla
8  Grace?
9    A  Paulette Coloma.
10    Q  Do you know why her name changed?
11    A  No.
12      (Off-the-record discussion.)
13    Q  (By Mr. Easley) In the safety position,
14  where was your office?
15    A  The Matson Navigation building at the
16  admin building.
17    Q  Is that at Pier 52?
18    A  Yes.
19    Q  And where is Priscilla's office?
20    A  In the same building.
21    Q  In your safety job, did you conduct any
22  safety meetings?
23    A  Excuse me. Yes.
24    Q  Can you describe those for me?
25    A  The safety meetings I've conducted were

## 25

1 for, excuse me, superintendents in Matson Terminals
2 on the proper way of doing safety meetings for
3 themselves, for their departments.
4  Q  Okay. Any other kinds of safety
5 meetings?
6  A  Just training.
7  Q  Training?
8  A  Training.
9  Q  For whose employees? Navigation or
10 Terminals?
11  A  Both.
12  Q  When you say training, can you be a
13 little more specific?
14  A  Accident investigation training, you
15 know, basically how to fill in the accident reports
16 and how to conduct an investigation. I've done
17 hazardous communication training and the general
18 safety awareness training for the new hires.
19  Q  When you say general safety awareness
20 training for new hires, when you say new hires,
21 what class of employer are we talking about when
22 you say new hires?
23  A  Supervisors, superintendents.
24  Q  Supervisors and superintendents.
25     As a safety person, do you ever conduct

## 26

1 training directly for the longshoremen?
2  A  Yes.
3  Q  Can you tell me the nature of that?
4  A  I do -- well, I did power industrial
5 truck classroom training for the Matson Terminals
6 machine operators.
7  Q  Power and industrial truck --
8  A  Training.
9  Q  -- training for Matson --
10  A  Terminals machine operators.
11  Q  -- Matson Terminals machine operators.
12 Okay. All right.
13  A  And then I also do -- I work with Randy
14 Lund from the National Cargo Bureau to do placard
15 recognition training for the machine operators as
16 well.
17  Q  Were you ever involved in training of
18 McCabe employees?
19  A  Only the sub MO's who are full-time MO's.
20  Q  That's what I thought you were going to
21 say.
22  A  Yeah, the full-time MO's.
23  Q  To your knowledge, do Matson Navigation
24 or Matson Terminals put out what we call safety
25 bulletins?

## 27

1  A  No.
2  Q  In your safety position, did you ever go
3 on Matson Navigation vessels?
4  A  Yes.
5  Q  How often?
6  A  A couple times a month.
7  Q  Would it be fair to say that you went on
8 all the Matson Navigation vessels in Honolulu?
9  A  I haven't been on the Maunawili yet, but
10 other than that, yes.
11  Q  Can you spell that?
12  A  The Maunawili, M-a --
13  Q  Oh, Maunawili, that's the new one?
14  A  Yeah, that's the only one I haven't been
15 on to look at.
16  Q  When I say Matson Navigation vessels, I'm
17 also using that word to include barges.
18  A  Yes.
19  Q  By telling you that, would your answer
20 change?
21  A  No.
22  Q  And I take it that this couple times a
23 month on Matson Navigation vessels is done during
24 your whole four years in the safety position?
25  A  Yes.

## 28

1  Q  What was the purpose of those vessel
2 visits?
3  A  Primarily either hazardous materials
4 response or accident investigation or response to a
5 union safety issue or an OSHA inspection. Those
6 are the primary reasons.
7  Q  And I take it that during that time that
8 you were the safety person, you had occasion to go
9 on the Lihue?
10  A  Yes.
11  Q  And the Chief Gadao?
12  A  Yes.
13  Q  Are the Lihue and Chief Gadao sister
14 vessels?
15  A  Yes.
16  Q  Does that mean they're same design, same
17 configuration?
18  A  That's my understanding.
19  Q  In the safety job, did you ever go on
20 Matson vessels to conduct a safety inspection?
21  A  No.
22  Q  Are you aware of any safety checklist
23 used on Matson vessels that could be used by either
24 Terminals or Navigation people?
25  A  Yes.

**45**

1   A   Not in my safety position.
2   Q   In environmental?
3   A   Yes.
4   Q   In what regard?
5   A   With regard to the wastes in the
6   terminal.
7   Q   What does that entail?
8   A   That they're required to have that stuff
9   pumped out in the terminal. They can't just let it
10  overflow and flow into our storm drains.
11  Q   I'm not exactly sure. Can you just
12  clarify that a little bit for me?
13  A   Sometimes when the livestock comes off
14  and they're in the terminal waiting to be loaded
15  back to the ship --
16  Q   Uh-huh.
17  A   -- or waiting for the trucker to come
18  pick it up, sometimes the stock tenders, since they
19  have the water access right there, they'll just
20  flood the container with water, and sometimes the
21  water overflows the trough, and whatever waste is
22  on the ground of the container sometimes spills out
23  onto the terminal.
24  Q   Onto the dock?
25  A   Well, into the container yard area where

**46**

1   it's parked.
2   Q   Okay.
3   A   And it's location is near to our storm
4   drains. So I get -- we get on their case about
5   they need to clean that stuff up. They can't just
6   let that stuff flow into the storm drains because
7   it's a violation of our permits.
8   Q   That can also be a very unpleasant
9   situation.
10  A   Uh-huh. But that's my involvement with
11  the stock tenders.
12  Q   Fair enough. I'm not sure if I asked you
13  this before. Forgive me if I have. Are you aware
14  of any prior complaints, suggestions or
15  recommendations regarding gaps such as the one in
16  Exhibit 2?
17      MR. BALDEMOR: Objection. Asked and
18  answered.
19  Q   (By Mr. Easley) You can answer.
20  A   Not that I'm aware of.
21  Q   Just to make sure I've completely covered
22  all the bases, other than Exhibit 1 --
23      And, also, when I ask you this question
24  about documents and photos regarding the accident,
25  I'm excluding documents generated by me like

**47**

1   pictures I took. So I'm not asking you --
2   A   Understood.
3   Q   -- to answer this question in context of
4   documents I may have generated.
5       Are you aware of any reports, photos or
6   witness statements pertaining to the Meyer accident
7   other than Exhibit 1?
8       MR. BALDEMOR: Objection. Asked and
9   answered.
10  Q   (By Mr. Easley) You can answer it.
11  A   No, I'm not.
12  Q   Did the Meyer accident show up in any
13  vessel crew logs to your knowledge?
14  A   No.
15      MR. BALDEMOR: Objection. Asked and
16  answered.
17      MR. EASLEY: Okay. Those are all my
18  questions.
19      MR. BALDEMOR: Thanks, Keahi.
20      (Whereupon the proceedings
21      were adjourned at 10:10 a.m.)

**48**

1   I, the undersigned, KEAHI BIRCH, being
2   first duly sworn say:
3   I have read and/or had translated the
4   foregoing deposition and know the contents thereof,
5   and I certify that the same is true of my own
6   knowledge, except as to those matters which are
7   therein stated upon my information and belief, and
8   as to those matters, I believe it to be true.
9   I declare under penalty of perjury that
10  the foregoing is true and correct.

12  Executed on _____,
13  2004, at _____.

17  _____
    KEAHI BIRCH

JAN FLOATE & ASSOCIATES            (808) 263-1149            Page 45 to Page 48