# CONDENSED TRANSCRIPT
## IN THE MATTER OF

**BERT MEYER**

**vs.**

**MATSON NAVIGATION COMPANY, INC.**

**DEPOSITION OF KEAHI BIRCH**

**CIVIL NO. 04-00049**

**TAKEN: NOVEMBER 9, 2004**

**REPORTED BY: LAURA SAVO, RPR, CSR**

**JAN FLOATE & ASSOCIATES**
**P.O. BOX 1821**
**KAILUA, HAWAII 96734**
**(808) 263-1149**

EXHIBIT F

**Page 1**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

BERT MEYER,            ) CIVIL NO. CV 04-00049
                       )            HG-BMK
        Plaintiff,     ) (In Admiralty)
                       )
    vs.                )
                       )
MATSON NAVIGATION      )
COMPANY, INC.,         )
                       )
        Defendant.     )
_____)

DEPOSITION OF KEAHI BIRCH

Taken on behalf of the Plaintiff pursuant to Notice, on Tuesday, November 9, 2004, commencing at 8:55 a.m., at the Law Offices of Goodsill Anderson Quinn & Stifel, Alii Place, Suite 1800, 1099 Alakea Street, Honolulu, Hawaii 96813.

**Page 2**

1  APPEARANCES:
2
3    For Plaintiff:
4       PRESTON EASLEY, ESQ.
        Law Offices of Preston Easley
5       2500 Via Cabrillo Marina, Suite 106
        San Pedro, California 90731-7724
6       (310) 832-5315
7    For Defendant:
8       RANDOLPH L. BALDEMOR, ESQ.
        Goodsill Anderson Quinn & Stifel
9       Alii Place, Suite 1800
        1099 Alakea Street
10      Honolulu, Hawaii 96813
        (808) 547-5600
11
12
13
14
15
16
17
18   REPORTED BY:  Laura Savo, CSR No. 347
                   Notary Public, State of Hawaii
19
20                     -oOo-
21
22
23
24
25

**Page 3**

                        I N D E X
EXAMINATION:                                    PAGE
   By Mr. Easley                                  4


EXHIBITS FOR IDENTIFICATION:

Exhibit 1                                        30
(1-page accident report marked received 10-2-02)

Exhibit 2                                        30
(1-page photocopy of photograph)


UNANSWERED QUESTIONS AS REQUESTED BY COUNSEL:

PAGE     LINE
 31        4

**Page 4**

1    (Pursuant to Rule 14 of the Rules Governing Court
2  Reporting in Hawaii, the reporter's disclosure was
3  made and is attached hereto.)
4              KEAHI BIRCH,
5  having been called as a witness and being first
6  duly sworn to tell the truth, the whole truth and
7  nothing but the truth, was examined and testified
8  as follows:
9              EXAMINATION
10 BY MR. EASLEY:
11     Q   Would you state your name for the record,
12 please.
13     A   Excuse me.  My legal name is Joleeann
14 Keahi Birch, but I go by Keahi Birch at work.
15 That's what it says on my business card.
16     Q   Can you spell your first name.
17     A   Sure.  J-o-l --
18     Q   J-o-l --
19     A   -- e-e --
20     Q   -- e-e --
21     A   -- a-n-n.
22     Q   -- a-n-n.  And then Keahi is K-e-h --
23 K-e-a-h-i; right?
24     A   Yes.
25     Q   And then Birch, B-i-r-c-h?

**Page 25**

1 for, excuse me, superintendents in Matson Terminals
2 on the proper way of doing safety meetings for
3 themselves, for their departments.
4      Q   Okay. Any other kinds of safety
5 meetings?
6      A   Just training.
7      Q   Training?
8      A   Training.
9      Q   For whose employees? Navigation or
10 Terminals?
11     A   Both.
12     Q   When you say training, can you be a
13 little more specific?
14     A   Accident investigation training, you
15 know, basically how to fill in the accident reports
16 and how to conduct an investigation. I've done
17 hazardous communication training and the general
18 safety awareness training for the new hires.
19     Q   When you say general safety awareness
20 training for new hires, when you say new hires,
21 what class of employer are we talking about when
22 you say new hires?
23     A   Supervisors, superintendents.
24     Q   Supervisors and superintendents.
25         As a safety person, do you ever conduct

**Page 26**

1 training directly for the longshoremen?
2      A   Yes.
3      Q   Can you tell me the nature of that?
4      A   I do -- well, I did power industrial
5 truck classroom training for the Matson Terminals
6 machine operators.
7      Q   Power and industrial truck --
8      A   Training.
9      Q   -- training for Matson --
10     A   Terminals machine operators.
11     Q   -- Matson Terminals machine operators.
12 Okay. All right.
13     A   And then I also do -- I work with Randy
14 Lund from the National Cargo Bureau to do placard
15 recognition training for the machine operators as
16 well.
17     Q   Were you ever involved in training of
18 McCabe employees?
19     A   Only the sub MO's who are full-time MO's.
20     Q   That's what I thought you were going to
21 say.
22     A   Yeah, the full-time MO's.
23     Q   To your knowledge, do Matson Navigation
24 or Matson Terminals put out what we call safety
25 bulletins?

**Page 27**

1      A   No.
2      Q   In your safety position, did you ever go
3 on Matson Navigation vessels?
4      A   Yes.
5      Q   How often?
6      A   A couple times a month.
7      Q   Would it be fair to say that you went on
8 all the Matson Navigation vessels in Honolulu?
9      A   I haven't been on the Maunawili yet, but
10 other than that, yes.
11     Q   Can you spell that?
12     A   The Maunawili, M-a --
13     Q   Oh, Maunawili, that's the new one?
14     A   Yeah, that's the only one I haven't been
15 on to look at.
16     Q   When I say Matson Navigation vessels, I'm
17 also using that word to include barges.
18     A   Yes.
19     Q   By telling you that, would your answer
20 change?
21     A   No.
22     Q   And I take it that this couple times a
23 month on Matson Navigation vessels is done during
24 your whole four years in the safety position?
25     A   Yes.

**Page 28**

1      Q   What was the purpose of those vessel
2 visits?
3      A   Primarily either hazardous materials
4 response or accident investigation or response to a
5 union safety issue or an OSHA inspection. Those
6 are the primary reasons.
7      Q   And I take it that during that time that
8 you were the safety person, you had occasion to go
9 on the Lihue?
10     A   Yes.
11     Q   And the Chief Gadao?
12     A   Yes.
13     Q   Are the Lihue and Chief Gadao sister
14 vessels?
15     A   Yes.
16     Q   Does that mean they're same design, same
17 configuration?
18     A   That's my understanding.
19     Q   In the safety job, did you ever go on
20 Matson vessels to conduct a safety inspection?
21     A   No.
22     Q   Are you aware of any safety checklist
23 used on Matson vessels that could be used by either
24 Terminals or Navigation people?
25     A   Yes.

**29**

1  Q  What safety checklist are you aware of?
2  A  The vessel inspection checklist.
3  Q  It's called "vessel inspection
4  checklist"?
5  A  Yeah, to the best that I remember. It's
6  a two-page sheet.
7  Q  And who uses that document?
8  A  The superintendent and the representative
9  from the vessel.
10  Q  When do they use it?
11  A  Preshift -- prestart-up shifts. So,
12  basically, the first shift when a vessel arrives.
13  Q  Is it Matson Navigation policy that a
14  stevedore superintendent and a vessel
15  representative conduct some type of prestevedoring
16  work vessel inspection?
17     MR. BALDEMOR: Objection. Leading.
18  Q  (By Mr. Easley) You can go ahead and
19  answer.
20  A  Yes.
21  Q  Is that policy in writing anywhere?
22  A  I'm not sure. I'm not sure.
23  Q  Okay. Look at Exhibit 1 which is the
24  accident report for Bert Meyer's accident. Have
25  you ever seen that document before?

**30**

1  A  Yes.
2     (Exhibit 1 is marked
3     for identification.)
4  Q  (By Mr. Easley) When did you first see
5  it?
6  A  Last -- let's try that again. In October
7  2002 when it was received by my office.
8  Q  Did you do any type of investigation of
9  that accident yourself?
10  A  No.
11  Q  Did you have any discussions with anybody
12  else that investigated the accident?
13  A  No.
14  Q  I'm going to show you a photograph. This
15  is actually a photograph of Bert Meyer on the
16  Lihue, and he's got his left foot poised over the
17  gap that he contends that he fell through.
18     Have you ever seen that gap or ones like
19  it on the Lihue before?
20     MR. BALDEMOR: Objection. First of all,
21  is this an exhibit?
22     MR. EASLEY: That's Exhibit 2.
23     MR. BALDEMOR: Exhibit 2.
24     (Exhibit 2 is marked
25     for identification.)

**31**

1     THE WITNESS: No.
2  Q  (By Mr. Easley) No?
3  A  No.
4  Q  To your knowledge, does that gap where
5  his left foot is violate any Matson Navigation
6  Company safety policies?
7     MR. BALDEMOR: Objection. It lacks
8  foundation, calls for speculation, calls for a
9  legal conclusion, and I'm not going to let you
10  answer that.
11  Q  (By Mr. Easley) Are you aware of any
12  other incidents of anyone stepping into gaps on the
13  Lihue or Chief Gadao similar to the gap depicted in
14  Exhibit 2?
15  A  No.
16  Q  Mr. Meyer has previously testified that
17  live animals were being carried on the vessel and
18  that there was a lot of slime on walking surfaces
19  on the vessel created by the fact that there were
20  live animals on the vessel. Are you aware of any
21  accidents occurring on any Matson Navigation
22  vessels because someone contended that they slipped
23  or fell on a surface that had animal waste on it?
24  A  No.
25  Q  Have you ever heard any complaints on

**32**

1  that issue before?
2  A  No.
3  Q  Have you ever heard any complaints about
4  any of the gaps between the hatch lids and the
5  catwalks on the Lihue or the Gadao similar to that
6  depicted in Exhibit 2?
7  A  No.
8  Q  To your knowledge, did anybody at Matson
9  Navigation conduct any investigation of Mr. Meyer's
10  accident?
11  A  No, not to my knowledge.
12  Q  Okay. Did you ever discuss his accident
13  with anybody at Matson Navigation?
14  A  No. We've dis --
15     MR. BALDEMOR: I'm sorry. Can you
16  restate the question?
17     (The record was read.)
18     THE WITNESS: No.
19     MR. BALDEMOR: It misstates -- the
20  question has been asked and answered.
21  Q  (By Mr. Easley) Did you ever hear anybody
22  at Matson Navigation discuss the accident?
23  A  No.
24  Q  Are you aware of any documents generated
25  by Matson Navigation that referenced the accident

## 45

1   A   Not in my safety position.
2   Q   In environmental?
3   A   Yes.
4   Q   In what regard?
5   A   With regard to the wastes in the
6   terminal.
7   Q   What does that entail?
8   A   That they're required to have that stuff
9   pumped out in the terminal. They can't just let it
10  overflow and flow into our storm drains.
11  Q   I'm not exactly sure. Can you just
12  clarify that a little bit for me?
13  A   Sometimes when the livestock comes off
14  and they're in the terminal waiting to be loaded
15  back to the ship --
16  Q   Uh-huh.
17  A   -- or waiting for the trucker to come
18  pick it up, sometimes the stock tenders, since they
19  have the water access right there, they'll just
20  flood the container with water, and sometimes the
21  water overflows the trough, and whatever waste is
22  on the ground of the container sometimes spills out
23  onto the terminal.
24  Q   Onto the dock?
25  A   Well, into the container yard area where

## 46

1   it's parked.
2   Q   Okay.
3   A   And it's location is near to our storm
4   drains. So I get -- we get on their case about
5   they need to clean that stuff up. They can't just
6   let that stuff flow into the storm drains because
7   it's a violation of our permits.
8   Q   That can also be a very unpleasant
9   situation.
10  A   Uh-huh. But that's my involvement with
11  the stock tenders.
12  Q   Fair enough. I'm not sure if I asked you
13  this before. Forgive me if I have. Are you aware
14  of any prior complaints, suggestions or
15  recommendations regarding gaps such as the one in
16  Exhibit 2?
17  MR. BALDEMOR: Objection. Asked and
18  answered.
19  Q   (By Mr. Easley) You can answer.
20  A   Not that I'm aware of.
21  Q   Just to make sure I've completely covered
22  all the bases, other than Exhibit 1 --
23  And, also, when I ask you this question
24  about documents and photos regarding the accident,
25  I'm excluding documents generated by me like

## 47

1   pictures I took. So I'm not asking you --
2   A   Understood.
3   Q   -- to answer this question in context of
4   documents I may have generated.
5   Are you aware of any reports, photos or
6   witness statements pertaining to the Meyer accident
7   other than Exhibit 1?
8   MR. BALDEMOR: Objection. Asked and
9   answered.
10  Q   (By Mr. Easley) You can answer it.
11  A   No, I'm not.
12  Q   Did the Meyer accident show up in any
13  vessel crew logs to your knowledge?
14  A   No.
15  MR. BALDEMOR: Objection. Asked and
16  answered.
17  MR. EASLEY: Okay. Those are all my
18  questions.
19  MR. BALDEMOR: Thanks, Keahi.
20  (Whereupon the proceedings
21  were adjourned at 10:10 a.m.)

## 48

1   I, the undersigned, KEAHI BIRCH, being
2   first duly sworn say:
3   I have read and/or had translated the
4   foregoing deposition and know the contents thereof,
5   and I certify that the same is true of my own
6   knowledge, except as to those matters which are
7   therein stated upon my information and belief, and
8   as to those matters, I believe it to be true.
9   I declare under penalty of perjury that
10  the foregoing is true and correct.

    Executed on _____.
    2004, at _____,
    _____.


    _____
    KEAHI BIRCH