IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| BERT MEYER,<br><br>          Plaintiff,<br><br>   vs.<br><br>MATSON NAVIGATION COMPANY,<br>INC.; and PACIFIC LIVESTOCK,<br>INC.,<br><br>          Defendants. | CIVIL NO. 1:04cv 00049JMS-BMK<br>(In Admiralty)<br><br><br>MEMORANDUM IN SUPPORT OF<br>MOTION |

## MEMORANDUM IN SUPPORT OF MOTION

## I.      INTRODUCTION

The instant lawsuit involves a slip-and-fall aboard the *S/S Lihue* on

October 1, 2002.  Defendant Matson Navigation Company, Inc. ("Matson

Navigation"), was the owner of the *S/S Lihue*.[1]  Plaintiff Bert Meyer ("Meyer"), an

experienced longshoreworker, alleges he slipped on animal urine and feces while

working on the vessel, thereby causing him injuries.

According to the tariff governing Pacific Livestock's cargo (i.e.

Freight Tariff No. 14-F), Pacific Livestock is obligated to

---

[1]    *See* Defendant Matson Navigation Company, Inc.'s Separate and Concise
Statement in Support of Motion for Summary Judgment Against Pacific Livestock,
Inc. ("SCS"), at ¶1.

> . . . indemnify Matson and hold it harmless in respect of
> any injury or death of any person . . . or any other loss . .
> . or expenses, including, but not limited to, lost profits
> and attorneys' fees, caused by the acts or omissions of
> any livestock attendant provided by the shipper.

SCS, at ¶7.  Since it is Meyer's position that the accident was caused by Pacific

Livestock's conduct, Matson Navigation now moves for summary judgment

dismissing Pacific Livestock's cross-claim and requiring Pacific Livestock to

indemnify and hold Matson Navigation harmless with respect to the accident in

question.

## II.    FACTS

### A.    Background

Meyer claims that on October 1, 2002, at approximately 7:00 p.m., he

slipped on a padeye located on a hatch cover on the *S/S Lihue* between rows 15 and

16.  At the time of the accident, he was working as a longshoreworker for Matson

Terminals, Inc.[2]

Meyer's claims are based on the fact that he slipped on animal

feces and urine.  On May 21, 2004, Meyer responded to Matson's first

request for answers to interrogatories.  In his responses, he described the

accident as follows:

---

[2]    At the time of the accident, Meyer was on labor loan (i.e. a "borrowed-servant") to the stevedore, Matson Terminals, Inc.

2

> I was unlashing cones with a pole between rows 15 and 16. My left
> foot was on the catwalk and my right foot was on a padeye on the
> hatch lid. My **right foot slipped** and I lost my balance and fell. My
> left leg went into the gap between the catwalk and the hatch lid and I
> was stuck. I was yelling for help for awhile, then Danny Kaneala
> helped me get out of the gap.

Exh. 5, attached to SCS, at p. 6. He claimed Matson Navigation was negligent

because

> **[t]he whole area was covered in pig urine and feces so it made it
> real slippery.** Also, there should have been a guardrail or cover to
> prevent me from falling into the gap between the catwalk and the
> hatch cover.

Exh. 5, attached to SCS, at p. 6 (emphasis added).

On September 27, 2004, Meyer amended his interrogatory response

describing the accident:

> I was unlocking a cone with a pole between rows 15 and 16. My right
> foot was on the catwalk and my left foot was on a padeye on the hatch
> lid. **My left foot slipped and I lost my balance and fell**. My left leg
> went into the gap between the catwalk and the inshore side of the
> hatch lid and I was stuck. I was yelling for help for awhile, then Dan
> Farney helped me get out of the gap.

Exh. 6, attached to SCS, at pp. 1-2 (emphasis added). Meyer's expert, Robert

Riley, concedes that the precipitating cause of the accident was the presence of

animal waste on the padeye in question. *See* SCS, at ¶18.

On the date of the accident, Co-Defendant Pacific Livestock, Inc.

("Pacific Livestock") was the shipper of containers carrying hogs aboard the *S/S*

*Lihue.* *See* SCS, at ¶2. Pacific Livestock hired two livestock tenders, John Davis and Greg Kinnell, to accompany and tend to the hogs. *See* SCS, at ¶3.

Meyer claims that "Defendants negligently failed to ensure that all animal waste was cleaned off the catwalks and hatch covers aboard S/S LIHUE on October 1, 2002, prior to the start of cargo operations by the longshoremen." Exh. 1, attached to SCS, at ¶8. However, the facts make clear that the responsibility for washing down the catwalks and hatch covers where the accident occurred belonged to Pacific Livestock and its animal tenders.

The applicable tariff, Freight Tariff No. 14-F, provides that livestock attendants are required to "comply with Matson rules and regulations governing their conduct and duties while in Matson yards or on Matson vessels." SCS, at E. These rules and regulations placed the obligation for washing-down livestock areas upon Pacific Livestock. Eric Johnson, the chief mate on the date of the accident, testified at his deposition as follows:

> Q.     Okay. Are the livestock tenders supposed to do any type of wash-down before the longshoremen come aboard?
>
> A.     Yes, they do. I'm not sure what their – I can't remember what their specific requirements are for washing them, but they are washed down and cleaned up before the ship arrives.
>
> Q.     Before the ship arrives?

A.    Before the ship arrives in port, yes.

\* \* \*

Q.    How do the livestock tenders know they're supposed to do this wash-down?

A.    They have instructions.  I'm not sure whether they're specific Matson instructions or whether they were just ship specific instructions. But they were told what was expected of them for wash-down, and I just don't remember what they were.

Q.    Okay.  On the voyage in question, who's the one that told them what to do?

A.    The chief mate would be the one that would give them instructions.

Q.    And that would have been you?

A.    Yes.

Q.    Okay.  So you would – you would tell them when it's time to do the wash-down; is that right?

A.    I wouldn't tell them.  We gave them what – we gave them their instructions when they came aboard the vessel.

Q.    You did?

A.    And then I would verify that they are doing their job?

Q.    Were you one of the people that gave them their instructions when they came aboard for the voyage?

A.    Yes.

Q.    Okay.  Was that in Oakland?

A.    I believe that was in Oakland, yes.

Exh. 4, attached to SCS, at pp. 24:4-12; 24:23-25:23.[3]  Livestock tenders were also

required to comply with the instructions to wash-down livestock areas pursuant to

Matson Navigation Company Policy Number E-01-040, 4.8, providing:

> **Comply with Regulations** – The Livestock Tender **shall comply with rules and regulations, and comply with any special requirements during the voyage as requested by the Master or Chief Officer.**  This may include responding to reported problems with the livestock, assisting in the prevention of contamination or adjacent cargo due to the proximity of the livestock, disposing of dead animals, and other reasonable requests that may arise.

Exh. F, attached to SCS (emphasis added).

## III.    ARGUMENT

### A.    Standard of Review

Summary judgment is appropriate when there is no genuine issue as to

any material fact and the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c).  The moving party has the initial burden of "identifying for

the court the portions of the materials on file [in the case] that it believes

---

[3]    Chief Mate Johnson's instructions were consistent with Matson Navigation Company Policy Number E-01-040, 4.11, providing:

> **Daily Washdown** – The Livestock Tender shall attach drain hoses and wash down containers/trailers on a daily basis when authorized to do so by the Chief Officer.

Exh. E, attached to SCS.

demonstrate the absence of any genuine issue of material fact." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)). If the moving party meets its burden, then the opposing party may not defeat a motion for summary judgment in the absence of any significant probative evidence tending to support its legal theory. *See Commodity Futures Trading Comm'n v. Savage*, 611 F.2d 270, 282 (9th Cir. 1979). The opposing party cannot stand on its pleadings, nor can it simply assert that it will be able to discredit the movant's evidence at trial. *See T.W. Elec. Serv.*, 809 F.2d at 630; Fed. R. Civ. P. 56(e). In considering a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party. *State Farm Fire & Casualty Co. v. Martin*, 872 F.2d 319, 320 (9th Cir. 1989).

**B.** **As a matter of law, Pacific Livestock is obligated to indemnify and hold Matson Navigation harmless for any damages arising out of the accident in question.**

**1.** **Pacific Livestock is bound to the indemnity and hold harmless provisions of Freight Tariff No. 14-F, STB MATS No. 34.**

A bill of lading is a starting point for determining the terms for carriage of goods. "A bill of lading records that a carrier has received goods from the party that wishes to ship them, states the terms of carriage, and serves as

evidence of the contract of carriage." *Norfolk Southern Railway Co. v. Kirby*, 125

S.Ct. 385, 2004 LEXIS 7510, at *10 (2004).

In this case, the bills of lading and the freight bills governing Pacific

Livestock's cargo specifically referenced Freight Tariff No. 14-F. *See* Exhs. A-D.

Therefore, Pacific Livestock was bound by the terms of the tariff. "[A] tariff,

required by law to be filed, is not a mere contract. *It is the law.*" *Brown & Root,*

*Inc. v. M/V Peisander*, 648 F.2d 415, 421 (5th Cir. 1981); *see also Foster Wheeler*

*Energy Corp. v. An Ning Jiang MV*, 383 F.3d 349, 359 (5th Cir. 2004) (citing *M/V*

*Peisander* for the same proposition); *NACA Logistics (USA) Inc. v. COSCO*

*Container Lines Co., Ltd.*, No. C04-1855Z, 2005 U.S. Dist. LEXIS 33601 (W.D.

Wash. September 6, 2005) (upholding package limitation found in tariff).

###      2.      Pacific Livestock had notice, actual or constructive, of the tariff provision in question.

Pacific Livestock may argue that it was ignorant of the provision in

question. However, the bill of lading and freight bill specifically reference the

tariff. Moreover, "[h]istorically, a tariff on file with the ICC [(now replaced by the

Surface Transportation Board)] was construed to have the effect of a statute and

give the shipper constructive notice of its terms." *Comsource Independent*

*Foodservice Companies, Inc. v. Union Pacific Railroad Company*, 102 F.3d 438,

434 (9th Cir. 1996); *see also Atwood v. U W Freight Line, Inc.*, 127 F.Supp.2d 1155

(D. Idaho 1999) (stating that "the shipper is charged with knowledge of what the tariff contains"). In the Ninth Circuit, where the tariff is required by law to be in the tariff, the shipper is charged with constructive notice of the tariff. *See Comsource*, 102 F.3d at 442 ("tariff provisions required by law to be in the tariff ('mandatory' provisions) give constructive notice to the shipper"); *Port of Tacoma v. S.S. Duval*, 364 F.2d 615, 617 (9th Cir. 1966) ("It is settled, however, that such filing gives constructive notice . . . of everything contained in such published tariff schedules which is by law required to be therein inserted.")(internal citations and quotations omitted).[4]

---

[4]    It is Matson Navigation's position that the indemnity and hold harmless provision in question was required to be filed with the Surface and Transportation Board because it relates to the rate and terms of service. The rate is commensurate with the service provided, and Matson Navigation's understanding of the agreement is that the shipper hires livestock attendants and indemnifies and holds Matson harmless for their conduct. *See* Declaration of Steve Rubin ("Rubin Decl."), at ¶7. With respect to the commodity in question (i.e. hogs), the indemnity provided by the shipper would have been a component, among other things, of the rate charged.. *See* Rubin Decl., at ¶7. Notably, however, non-mandatory tariff provisions will be enforced where "reasonable notice" of the tariff provision is given to the shipper. *Comsource Independent Foodservice Companies, Inc.*, 102 F.3d at 443. Consideration is given to "whether the provision in the tariff was specifically brought to the shipper's attention . . .[;] the shipper's sophistication, abundant experience, or extensive prior dealings with a carrier[;] . . . whether the shipper drafted the contract and directly negotiated its terms[;] . . . and whether the tariff provision was specifically reproduced in the bill of lading". *Id.* at 444 (internal citations and quotations omitted). Matson Navigation submits the balance of factors supports the conclusion that Pacific Livestock had "reasonable notice" of the tariff in question.

The requirements for filing tariffs in the non-contiguous domestic trade are set forth by statute and regulation. According to 49 U.S.C. §13702(b), a carrier "**shall** publish and filed with the [Surface Transportation Board] tariffs containing the rates established . . . (2) . . . [and] any rules that change, affect, or determine any part of the published rate." (emphasis added). The Surface Transportation Board also has the power to "prescribe any specific information and charges to be identified in a tariff." 49 U.S.C. §13702(b)(2). According to 49 C.F.R. §1312.3(a), "[t]ariffs filed with the [Surface Transportation Board] **must** include an accurate description of the services offered to the public; **must** provide the specific applicable rates (or the basis for calculating the specific applicable rates) and service terms. . . ." (emphasis added). Therefore, on October 1, 2002, Matson Navigation's tariffs were filed with the Surface Transportation Board. *See* Rubin Decl., at ¶4.

The indemnity and hold harmless provision in question bears a reasonable relation to the "rates" and "service terms" between Matson Navigation and the shipper. *See* Rubin Decl., at ¶7. Consequently, that provision falls within the filing requirements of the statute and its implementing regulations, and should be deemed a "mandatory" provision for which Pacific Livestock is charged with constructive notice of its terms.

A finding of constructive notice is also appropriate because Pacific Livestock is a sophisticated shipper. Prior to October 1, 2002 – the date of the accident, Pacific Livestock shipped cargo with Matson Navigation on many occasions. *See* SCS, at ¶12. As a sophisticated shipper with extensive experience shipping cargo on Matson vessels, Pacific Livestock had ample time to become knowledgeable regarding the tariff and its terms.

Pacific Livestock contacted Matson Navigation and arranged for the shipment of the cargo in question. As the initiating party, it clearly had the opportunity to negotiate the terms of the shipment at this time and inquire with Matson Navigation as to the tariff in question. If Pacific Livestock did not know the terms of the tariff, it should have reviewed them. This it could easily have done, as the tariff was available to Pacific Livestock and on file with the Surface Transportation Board. *See* Rubin Decl., at ¶4. Under these circumstances, Pacific Livestock should be charged with knowledge of the tariff. *See Norton v. Phillips*, 901 F.2d 821 (10th Cir. 1990) ("Carriers should not be held to a standard that would impose liability on them due to a unilateral mistake by an experienced shipper."); *Mechanical Technology Inc. v. Ryder Truck Lines, Inc.*, 776 F.2d 1085 (2nd Cir. 1985) ("the shipper's sophistication is relevant . . . to whether it ought to have known of the provisions of the tariff"); *Nieman Marcus Group, Inc. v. Quast Transfer, Inc.*, Civ. No. 98 C 3122, 1999 U.S. Dist. LEXIS 9564 (N.D. Ill. 1999)

("As a sophisticated shipper, plaintiff is charged with knowledge of the applicable tariff.").

### 3. Pacific Livestock's conduct clearly caused the accident.

Having established the enforceability of the tariff and that Pacific Livestock should be deemed to have notice of the tariff, the Court should consider whether Pacific Livestock's conduct should be considered a "cause" of the accident. In doing so, the Court should consider Meyer's allegations.

Meyer is clearly basing his claim on the argument that Pacific Livestock's conduct caused the accident. He originally brought this lawsuit only against Matson Navigation but, recognizing the significance of Pacific Livestock's role in the accident, subsequently amended his complaint to name Pacific Livestock. *See* Exh. A, attached to SCS. In Meyer's view, the accident was caused by acts or omissions of the livestock tenders by failing to wash-down the deck:

> Q. So as you're standing there, you get the cone released and you're pushing up to release the pole from the wire and the cone?
>
> A. Yes.
>
> Q. And is that when the accident happened?
>
> A. Yes.
>
> Q. Describe for me as best as you recall what happened at that point?

A.    I remember getting the pole out and next thing I **slid** in the hole.

Q.    Did you actually feel your foot slide?

A.    Yes, I think I did.  I just felt my body go one way.

Q.    Okay.  And I appreciate what you've said about your body going one way.  I'm focusing on the foot.  **Did you actually feel your foot slip or slide on the padeye?**

**A.    I believe I did.**

\* \* \*

Q.    So your foot started **sliding sideways**?

A.    **Yes.**

Exh. 7, at pp. 102:5-103:3 (emphasis added).  Meyer's expert explains what caused

the slippage to occur:

Q.    Okay.  Would it be accurate to say that if Mr. Meyer's foot had not slipped, that his foot would not have gone into the opening between the catwalk and the hatch cover?

A.    **Probably would not in this particular instance.**

Q.    And I guess just to make sure, are you aware of anything else, like rain or grease or anything that would have caused his foot to slip off the padeye other than animal waste?

A.    My understanding is that there was no rain involved.

Q.    Okay.

A.    No moisture from the rain.

Q.    Okay.

A.    It was clear, is my understanding.

Q.    All right.  **But based on all the facts you know, was there any other reason for his foot to slip off that padeye other than animal waste being on the bottom of his shoe?**

A.    **I don't know of any other reason.**

Exh. 8, at pp. 187:18-188:13 (emphasis added).  The clear implication of this testimony is that Meyer would not have slipped and injured himself had there been no animal waste on the deck (i.e. the deck was properly washed down of animal waste by the livestock tenders).  Given these admissions on the part of Meyer, Pacific Livestock must be required to indemnify and hold Matson Navigation harmless for the aforesaid liability.

## IV.    CONCLUSION

Pacific Livestock had the obligation to wash-down rows 15 and 16 and ensure that the areas were clear of animal waste.  If Pacific Livestock failed to do this, as alleged by Meyer, it is obligated by the tariff to "indemnify Matson and hold it harmless in respect of any injury or death of any person . . . or any other loss . . . or expenses, including, but not limited to, lost profits and attorneys' fees [because such losses or expenses were] caused by the acts or omissions" of Pacific Livestock's tenders.  For this reason, Matson Navigation respectfully requests the

Court to grant summary judgment in its favor, dismissing Pacific Livestock's

cross-claim and finding that Pacific Livestock is obligated to indemnify and hold

Matson Navigation harmless for any liability arising from the accident in question.

DATED: Honolulu, Hawaii, February 14, 2006.

/s/ Randolf L.M. Baldemor
JOHN R. LACY
RANDOLF L.M. BALDEMOR

Attorneys for Defendant
MATSON NAVIGATION COMPANY,
INC.