GOODSILL ANDERSON QUINN & STIFEL
A LIMITED LIABILITY LAW PARTNERSHIP LLP

JOHN R. LACY             1397-0
   jlacy@goodsill.com
RANDOLF L. M. BALDEMOR   7421-0
   rbaldemor@goodsill.com
Alii Place, Suite 1800
1099 Alakea Street
Honolulu, Hawaii 96813
Telephone: (808) 547-5600
Facsimile: (808) 547-5880

Attorneys for Defendant
MATSON NAVIGATION COMPANY, INC.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| BERT MEYER,<br><br>      Plaintiff,<br><br>vs.<br><br>MATSON NAVIGATION COMPANY, INC.,<br><br>      Defendant. | CIVIL NO. 1:04cv 00049JMS-BMK<br>(In Admiralty)<br><br>DEFENDANT MATSON NAVIGATION COMPANY, INC.'S MEMORANDUM IN OPPOSITION TO DEFENDANT PACIFIC LIVESTOCK, INC.'S MOTION FOR LEAVE TO FILE THIRD-PARTY COMPLAINT FILED ON JANUARY 30, 2006; DECLARATION OF RANDOLF L.M. BALDEMOR; EXHIBITS "A" – "P"; CERTIFICATE OF SERVICE<br><br>Hearing Date: March 10, 2006<br>Time: 2:00 p.m.<br>Judge: Barry M. Kurren |

1216457.2

**DEFENDANT MATSON NAVIGATION COMPANY, INC.'S
MEMORANDUM IN OPPOSITION TO DEFENDANT PACIFIC
LIVESTOCK, INC.'S MOTION FOR LEAVE TO FILE
THIRD-PARTY COMPLAINT FILED ON JANUARY 30, 2006**

## I.   INTRODUCTION

The instant lawsuit arises out of a slip-and-fall occurring on Defendant Matson Navigation Company, Inc.'s ("Matson Navigation") vessel, *SS Lihue*, on October 1, 2002. Co-Defendant Pacific Livestock, Inc. ("Pacific Livestock") was shipping hogs on the voyage. Plaintiff Bert Meyer ("Meyer") was a longshoreworker, who was hired by the stevedore, Matson Terminals, Inc. ("Matson Terminals"), to assist in off-loading cargo from the vessel.

Matson Navigation opposes the instant motion brought by Pacific Livestock for two primary reasons. The proposed third-party complaint against Matson Terminals[1] is futile. Section 905(a) of the Longshore and Harbor Workers' Compensation Act ("LHWCA") bars Pacific Livestock's proposed third-party complaint because it is brought "on account of" the accident in question and Meyer's alleged injuries. Secondly, Pacific Livestock has not demonstrated the

---

[1]   Matson Terminals was the stevedore and, at the time of the accident, was Plaintiff Bert Meyer's ("Meyer") "employer" for purposes of the Longshore and Harbor Workers' Compensation Act. In this regard, Meyer has filed an administrative LHWCA claim against Matson Terminals. *See* Exh. A.

1216457.2

requisite due diligence and good cause for allowing leave to file the third-party complaint at this late juncture. Therefore, the motion to amend should be denied.[2]

## II. FACTS

Meyer claims that on October 1, 2002, at approximately 7:00 p.m., he slipped on a padeye located on a hatch cover on the *S/S Lihue* between rows 15 and 16.[3] At the time of the accident, he was working as a longshoreworker for Matson Terminals, Inc.[4]

On the voyage in question, Pacific Livestock was the shipper of containers carrying hogs aboard the *S/S Lihue*. *See* Exhs. C, D, E & F. Pacific Livestock hired two livestock tenders, John Davis and Greg Kinnell, to accompany and tend to the hogs. *See* Exh. G, at ¶5; Exh. H, at ¶8.

---

[2] Pacific Livestock is improperly attempting to use the instant motion as a vehicle for persuading Matson Terminals to withdraw its lien. In this regard, attached hereto as Exhibit B is a letter from Pacific Livestock's counsel to Matson Navigation's counsel, wherein Pacific Livestock agrees to withdraw its motion "[i]f Matson Terminals is willing to waive its lien". Matson Terminals' lien arose out of its workers compensation obligation under the LHWCA. In contrast, as more fully discussed herein, the LHWCA bars Pacific Livestock's cross-claim and Matson Terminals owes no tort or contractual obligation to indemnify Pacific Livestock.

[3] The facts in this section are submitted for background purposes only. Pacific Livestock's proposed amendment is capable of disposition as a matter of law pursuant to 33 U.S.C. §905(a).

[4] At the time of the accident, Meyer was on labor loan (i.e. a "borrowed-servant") to the stevedore, Matson Terminals.

The applicable tariff, Freight Tariff No. 14-F, provides that livestock attendants are required to "comply with Matson rules and regulations governing their conduct and duties while in Matson yards or on Matson vessels." *See* Exh. I. These rules and regulations placed the obligation for washing-down livestock areas upon Pacific Livestock. Eric Johnson, the chief mate on the date of the accident, testified at his deposition as follows:

> Q. Okay. Are the livestock tenders supposed to do any type of wash-down before the longshoremen come aboard?
>
> A. Yes, they do. I'm not sure what their – I can't remember what their specific requirements are for washing them, but they are washed down and cleaned up before the ship arrives.
>
> Q. Before the ship arrives?
>
> A. Before the ship arrives in port, yes.
>
> \* \* \*
>
> Q. How do the livestock tenders know they're supposed to do this wash-down?
>
> A. They have instructions. I'm not sure whether they're specific Matson instructions or whether they were just ship specific instructions. But they were told what was expected of them for wash-down, and I just don't remember what they were.
>
> Q. Okay. On the voyage in question, who's the one that told them what to do?

3

> A. The chief mate would be the one that would give them instructions.
>
> Q. And that would have been you?
>
> A. Yes.
>
> Q. Okay. So you would – you would tell them when it's time to do the wash-down; is that right?
>
> A. I wouldn't tell them. We gave them what – we gave them their instructions when they came aboard the vessel.
>
> Q. You did?
>
> A. And then I would verify that they are doing their job?
>
> Q. Were you one of the people that gave them their instructions when they came aboard for the voyage?
>
> A. Yes.
>
> Q. Okay. Was that in Oakland?
>
> A. I believe that was in Oakland, yes.

Exh. J, at pp. 24:4-12; 24:23-25:23.[5] Livestock tenders were also required to comply with the instructions to wash-down livestock areas pursuant to Matson

---

[5] Chief Mate Johnson's instructions were consistent with Matson Navigation Company Policy Number E-01-040, 4.11, providing:

> **Daily Washdown** – The Livestock Tender shall attach drain hoses and wash down containers/trailers on a daily basis when authorized to do so by the Chief Officer.

Exh. K.

4

Navigation Company Policy Number E-01-040, 4.8, providing:

> **Comply with Regulations** – The Livestock Tender **shall comply with rules and regulations, and comply with any special requirements during the voyage as requested by the Master or Chief Officer**. This may include responding to reported problems with the livestock, assisting in the prevention of contamination or adjacent cargo due to the proximity of the livestock, disposing of dead animals, and other reasonable requests that may arise.

Exh. K (emphasis added).[6]

Pacific Livestock's responsibility to wash down the decks is significant, as Meyer's claims are based on the fact that he slipped on animal feces and urine. On May 21, 2004, Meyer responded to Matson's first request for answers to interrogatories. In his responses, he described the accident as follows:

> I was unlashing cones with a pole between rows 15 and 16. My left foot was on the catwalk and my right foot was on a padeye on the hatch lid. My **right foot slipped** and I lost my balance and fell. My left leg went into the gap between the catwalk and the hatch lid and I

---

[6] It is misleading for Pacific Livestock to suggest in its motion that the accident was due to Matson Terminals' conduct. Pacific Livestock argues that Meyer informed Farney of the presence of animal feces, but it was Pacific Livestock's obligation to wash down the decks. Pacific Livestock's argument that the area was improperly illuminated is undermined by Meyer's own testimony. *See* Exh. O at pp. 57:8-23. Meyer testified the weather was "clear" (Exh. O, at p. 42:8-10); there were lights where the pens were located (*see* Exh. O, at pp. 42:25-43:2); the sun had not set yet (*see* Exh. O, at p. 51:4-13); he had no problems seeing the grate (*see* Exh. O, at p. 53:7-9); he could see the padeye in question (*see* Exh. O, at p. 53:10-11); and there was enough light at the time to see the padeye in question. *See* Exh. O, at p. 83:19-22.

was stuck. I was yelling for help for awhile, then Danny Kaneala helped me get out of the gap.

Exh. L, at p. 6. He claimed Matson Navigation was negligent because

> **[t]he whole area was covered in pig urine and feces so it made it real slippery.** Also, there should have been a guardrail or cover to prevent me from falling into the gap between the catwalk and the hatch cover.

Exh. L, at p. 6 (emphasis added).

On September 27, 2004, Meyer amended his interrogatory response describing the accident:

> I was unlocking a cone with a pole between rows 15 and 16. My right foot was on the catwalk and my left foot was on a padeye on the hatch lid. **My left foot slipped and I lost my balance and fell.** My left leg went into the gap between the catwalk and the inshore side of the hatch lid and I was stuck. I was yelling for help for awhile, then Dan Farney helped me get out of the gap.

Exh. M, at pp. 1-2 (emphasis added). Meyer's expert, Robert Riley, concedes that the precipitating cause of the accident was the presence of animal waste on the padeye in question. *See* Exh. N, at pp. 187-18-188:13. Thus, Meyer is clearly basing his claim, at least in part, on the argument that Pacific Livestock's conduct caused the accident.[7]

---

[7] In this regard, as the Court is aware, Meyer originally brought this lawsuit only against Matson Navigation but, recognizing the significance of Pacific Livestock's role in the accident, subsequently amended his complaint to name Pacific Livestock as a defendant.

## III. ARGUMENT

### A. Standard of Review

This Court has great discretion in addressing a motion for leave to implead. 3 *Moore's Federal Practice* §1421[3] at 14-57 (Matthew Bender 3d ed. 2005). In considering a motion for leave to file a third-party complaint, the Court should consider, among other things, undue delay and the futility of the amendment. *See* 3 *Moore's Federal Practice* at §1421[3]; *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1482 (9th Cir. 1997); *Jackson v. Bank of Hawaii*, 902 F.2d 1385, 1387 (9th Cir. 1990) (recognizing a court may deny a motion to amend "if permitting an amendment would . . . result in futility for lack of merit.") (emphasis added). A claim is considered to be "futile" if the claim will be inevitably be defeated on summary judgment. *See Roth v. Garcia Marquez*, 942 F.2d 617, 628-629 (9th Cir. 1991) (citing *Johnson v. American Airlines*, 834 F.2d 721, 724 (9th Cir. 1987)); *see also*, *Gabrielson v. Montgomery Ward & Co.*, 785 F.2d 762, 766 (9th Cir. 1986) ("any amendment would have been futile in that it could be defeated on a motion for summary judgment"); *Saul v. United States*, 928 F.2d 829, 843 (9th Cir. 1991) (Denial of amendment was proper where the amended complaint could not overcome the fundamental futility of the claims and the amended complaint would be subject to dismissal).

### B. Pacific Livestock's cross-claim is barred as a matter of law and is, therefore, futile.

In the absence of the existence of an independent, particularized obligation requiring indemnification, "the vast majority of courts have concluded that third party suits are precluded by statutory exclusivity provisions." *Santisteven v. Dow Chemical Co.*, 506 F.2d 1216, 1219 (9th Cir. 1974). In this case, the statutory exclusivity provision that is applicable is Section 905(a) of the LHWCA, which provides:

> §905 Exclusiveness of liability
>
> (a) The liability of an employer . . . **shall be exclusive and in place of all other liability** of such employer to the employee . . . and anyone otherwise entitled to recover damages from such employer at law or in admiralty on account of such injury or death. . . .

33 U.S.C. §905(a) (emphasis added). Consistent with the general rule regarding exclusivity provisions, Section 905(a) is commonly interpreted to bar indemnity claims by non-vessel owners (like Pacific Livestock) against the LHWCA employer where the basis for indemnity is non-contractual tort indemnity.[8]

---

[8] For a compilation of cases addressing this issue, *see* Russell J. Davis, Annotation, Right of Tortfeasor Other Than Vessel Jointly Responsible With Stevedore Or Other Employer For Injuries To Employee To Recover Indemnity From Employer Under Longshoremen's And Harbor Workers' Compensation Act, 47 A.L.R. Fed. 416 (2003) ("It appears to be established that a nonvessel against which a negligence action is brought by a longshoreman or other employee cannot

In *Zapico v. Bucyrus-Erie Co.*, 579 F.2d 714 (2nd Cir. 1978), a longshoreworker was killed during the course of loading a large hydrocrane on a vessel and suit was brought against the vessel owner, the manufacturer of the hydrocrane and the longshoreworker's employer. The hydrocrane was manufactured by defendant/third-party plaintiff Bucyrus-Erie Company ("Bucyrus"). Bucyrus cross-claimed against the employer alleging that it furnished an incompetent employee to drive the hydrocrane. The trial court entered judgment against Bucyrus and ordered that "upon payment by [Bucyrus] of the judgment . . . [it] shall recover from [the employer] . . . 50% of the amount . . . paid". *Id.* at 717 (internal citations omitted).

On appeal, the United States Court of Appeals for the Second Circuit reversed the lower court. Despite acknowledging that "[t]here was ample evidence that [the operator of the hydrocrane] was incompetent to operate a hydrocrane" (*id.*), the Court nevertheless concluded that Bucyrus' cross-claims were barred and the third-party complaint should be dismissed because the cross-claims were "on account of" the underlying tort and there was no contract-based indemnity.[9]

---

obtain indemnity from a concurrently negligent employer based on a theory of the employer's tort liability.").

[9] We recognize there may be an exception for contract based indemnity. However, there is no contract between Pacific Livestock and Matson Terminals. Where the third-party fails to offer evidence of an express or implied contract of

9

In *Travis v. International Multifoods Corp.*, 464 F.Supp. 503 (W.D.N.Y. 1978), an injured longshoreworker brought a claim for injuries sustained while unloading grain from a vessel. The longshoreworker was an employee of stevedore Great Lakes Associates, Inc. ("Great Lakes"), who was hired to scoop the grain into mechanical unloading equipment operated by another stevedore, International Multifoods Corp. ("International"). The longshoreworker was injured when a common machine bolt, supplied by International, gave way and unleashed a heavy steel chain that was linked to a cleat on a wall of the ship's hold.

Great Lakes, as the longshoreworker's employer, was insured for its liabilities under the LHWCA. Thus, the longshoreworker brought suit only against International. However, International cross-claimed against Great Lakes, seeking full indemnity. Although International settled the plaintiff's claims, the case proceeded towards trial on International's cross-claims against Great Lakes. At the close of International's case-in-chief, Great Lakes moved for a directed verdict. Relying on 33 U.S.C. §905(a), the trial court concluded that, as a matter of law, International's third-party complaint must be dismissed. In connection with its ruling, the trial court noted that "the evidence is unequivocal and

---

indemnity, summary judgment is proper. *See Pippen v. Shell Oil Co.*, 661 F.2d 378, 387 (5th Cir. 1981) (granting summary judgment to employer where third party "failed to offer any evidence that an express or implied contract of indemnity existed").

undisputed that there is no express contract to indemnity International". *Id.* at 507.[10]

Pacific Livestock's third-party claims against Matson Terminals clearly arose out of the October 1, 2002 accident in question. There is no independent basis for indemnification. In its motion or the proposed complaint, Pacific Livestock has not cited, nor can it cite to, any contract-based indemnification agreement (express or implied) with Matson Terminals. Thus, the claims asserted against Matson Terminals are clearly "on account of" the underlying accident occurring on October 1, 2002 and Pacific Livestock's claims are barred by 33 U.S.C. §905(a).[11]

---

[10] Although International argued that it was a third party beneficiary of Great Lakes' implied warranty of workmanlike performance to the vessel, the court explained "[t]he stevedore's warranty of performance of its services is plainly for the benefit of the vessel." *Id.*; *see also S.S. Seatrain La. Ex rel. Tyler Tanker Corp. v. California Stevedore & Ballast Co.*, 424 F.Supp. 180, 183 (N.D. Ca. 1976) ("the third parties cannot claim to be third-party beneficiaries of a contractual warranty of workmanlike performance running to the vessel since subsequent to the [1972 amendments to the LHWCA] it is perfectly clear no such underlying warranty exists").

[11] To the extent Pacific Livestock somehow asserts that it has a contract-based indemnification agreement, express or implied, with Matson Terminals, the motion should be denied without prejudice with the requirement that Pacific Livestock cite the source of the contract-based indemnification in its motion and complaint to allow for meaningful briefing on the issue.

### C. Pacific Livestock's motion is untimely and "good cause" does not exist to reopen the deadlines in the Rule 16 scheduling order.

"A scheduling order 'is not a frivolous piece of paper, idly entered, which can be cavalierly disregarded by counsel without peril.'" *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 610 (9th Cir. 1992) (quoting *Gestetner Corp. v. Case Equipment Co.*, 108 F.R.D. 138, 141 (D. Maine 1985)); *accord Shapardon v. West Beach Estates*, 172 F.R.D. 415, 417 (D. Haw. 1997) (quoting *Widhelm v. Wal-Mart Stores, Inc.*, 162 F.R.D. 591 (D. Neb. 1995) ("[a] scheduling order is an important tool in controlling litigation. . . Adherence to reasonable deadlines is . . . critical to maintaining the integrity in court proceedings"). Because Pacific Livestock is seeking to implead an additional party after the deadline for joining additional parties has passed, it must show "due diligence" and "good cause" for seeking the amendment of the Rule 16 scheduling order. *See Makin v. State of Hawaii*, 114 F.Supp. 2d 1017, 1029 (D. Haw. 1999) ("Although Plaintiffs were well aware of the deadlines imposed by the Scheduling Order, **Plaintiffs did not specifically request that the court modify its Scheduling Order, nor did it seek relief from the Scheduling Order**, as it was entitled to do. . . [T]he court finds that Plaintiffs did not conduct the necessary due diligence which could show good cause to amend the Scheduling Order.") (emphasis added). " Rule 16(b)'s 'good cause' standard primarily considers the **diligence** of the party

seeking the amendment. . . **[C]arelessness is not compatible with a finding of diligence** and offers no reason for a grant of relief. . . **If that party was not diligent, the inquiry should end.**" *Mammoth Recreations, Inc.*, 975 F.2d at 609 (emphasis added).

The deadline for naming additional parties has expired. In its motion, Pacific Livestock does not explain why there is "good cause" for the delay in seeking to file its third-party complaint. This delay is inexcusable. The instant lawsuit is over two years old. The Second Amended Complaint, which named Pacific Livestock as a defendant, was filed with the Court on May 25, 2005. *See* Exh. H.

Pacific Livestock cannot credibly claim the delay was due to the need to conduct discovery. With the exception of a vessel inspection and discovery requests which were only recently served upon Matson Navigation on February 3, 2006, Pacific Livestock has conducted no formal discovery. Thus, *the third-party complaint is not based on new information*. Pacific Livestock had the information it needed to determine whether to file a third-party complaint against Matson Terminals as far back as October 6, 2005, when Matson Navigation *voluntarily* provided Pacific Livestock with all documents that had been produced through discovery, *including the exhibits which support Pacific Livestock's motion and proposed third-party complaint*, in order to allow for a meaningful

13

mediation, which at the time was set for October 26, 2005. *See* Exh. P. Since Pacific Livestock was supposed to be reviewing these documents to allow for a meaningful mediation and Pacific Livestock's motion (herein) is based on these documents, there is no viable excuse for the four month delay in seeking to file a third-party complaint against Matson Terminals. Consequently, the requisite "due diligence" and "good cause" have not been established.

## IV.  CONCLUSION

For the foregoing reasons, Matson Navigation respectfully requests the Court to deny Pacific Livestock's motion.

DATED: Honolulu, Hawaii, February 17, 2006.

/s/ Randolf L.M. Baldemor
JOHN R. LACY
RANDOLF L. M. BALDEMOR

Attorneys for Defendant
MATSON NAVIGATION CO., INC.