```
 1              IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF HAWAII

 3                           ---oOo---

 4

 5   BERT MEYER,

 6                 Plaintiff,

 7        vs.                        No. 1:04cv00049JMS-BMK

 8   MATSON NAVIGATION COMPANY,
     INC.,
 9
                   Defendant.
10
          Deposition of
11
          ROBERT E. RILEY
12
          Thursday, August 25, 2005
13

14                      CERTIFIED

15                        COPY

16

17

18

19

20

21   REPORTED BY:  MARY DUTRA, CSR #9251

22

23              NOGARA REPORTING SERVICE
             130 Battery Street, Suite 580
24           San Francisco, California 94111
                    (415) 398-1889
25
                                              EXHIBIT "B"
```

```
 1        A.   Okay.
 2        Q.   At the time Mr. Meyer fell, was he looking
 3   up?
 4        A.   That's what I understand, yes.
 5        Q.   Had he finished unlocking the cones?
 6        A.   Not the particular one that was stuck.
 7        Q.   So he slipped while he was in the process of
 8   unlocking the cone?
 9        A.   Yes.  Trying to unlock the cone, yes.
10        Q.   By the way, prior to Mr. Meyer's fall, do
11   you know how many other longshoremen had walked along
12   the catwalk at rows 15 and 16?
13        A.   I would have no idea.
14        Q.   Do you have any understanding of whether
15   anybody had?
16        A.   Yes.  I have an understanding that many
17   people have walked that catwalk.
18        Q.   Okay.  Would it be accurate to say that if
19   Mr. Meyer's foot had not slipped, that his foot would
20   not have gone into the opening between the catwalk and
21   the hatch cover?
22        A.   Probably would not in this particular
23   instance.
24        Q.   And I guess just to make sure, are you aware
25   of anything else, like rain or grease or anything,
```

ATTORNEYS NOTES EXHIBITS

1  that would have caused his foot to slip off the padeye
2  other than animal waste?
3       A.  My understanding is that there was no rain
4  involved.
5       Q.  Okay.
6       A.  No moisture from the rain.
7       Q.  Okay.
8       A.  It was clear, is my understanding.
9       Q.  All right.  But based on all the facts you
10 know, was there any other reason for his foot to slip
11 off that padeye other than animal waste being on the
12 bottom of his shoe?
13      A.  I don't know of any other reason.
14      Q.  Okay.  Now going on down, you again make
15 reference to the Morishige and the Tavares cases.
16          First of all -- and in both of those cases,
17 Captain Riley, were the two longshoremen looking up or
18 having their attention diverted somewhere else when
19 they stepped into the opening?
20      A.  I don't remember either way.
21      Q.  As far as the mechanics of the accident, did
22 either one of them have any type of slippery substance
23 on their shoes?
24      A.  I don't know, but I don't think so.
25      Q.  So the photographs that you have as

1  working on the container rather than stepping up onto
2  the top of the padeye?
3      A.  As I understand what he said, he had to
4  step -- put his foot here (indicating) because it was
5  right in line with the job that he had to do.  So if
6  that's true, which I believe it is, then he couldn't
7  step over here (indicating) because that wouldn't be
8  in an area that was in line with where he had to do --
9  maybe couldn't even reach where he had to do the work.
10      Q.  Do you know exactly where his foot was
11  placed on that padeye?
12      A.  Right here on the top (indicating).
13      Q.  But I mean, exactly where on the top?
14      A.  I assume it to be the middle, but I'm -- you
15  know, I didn't get into it in that detail.
16      Q.  Okay.  But getting back to my question, was
17  there anything that would have prevented him from
18  putting his foot there other than his statement that
19  he wanted to be directly underneath the cone?
20      A.  I don't believe there's anything physically
21  preventing him from putting his foot there, no.
22          Excuse me.  Unless there were turnbuckles
23  still attached to the padeye and laying there, and I
24  don't know the situation.
25      Q.  So you're saying if a turnbuckle had been

<< NOGARA REPORTING SERVICE >>                    191

ATTORNEYS NOTES    EXHIBITS

1  secured to the padeye that he stepped up on --

2      A.  No, no.  Excuse me.  This one.  If this

3  padeye had turnbuckles attached to it, they would be

4  laying down here, and of course that would be taking

5  up some of the space there, yeah.

6      Q.  What would take up the space in that area

7  that I marked with an "X"?

8      A.  The turnbuckle.

9      Q.  What portion of the turnbuckle?

10     A.  The bottom of the turnbuckle or the clevis;

11 that's the pin that goes through the padeye.

12     Q.  Okay.  Is there anything that would have --

13 and I'm going to mark another area with the letter

14 "Y."

15     Is there anything that would have prevented

16 Mr. Meyer from putting his foot in the location I've

17 marked with the letter "Y" rather than on top of the

18 padeye?

19     A.  Anything that would have prevented him?  I

20 don't think so.

21     Q.  Okay.  Would you agree that it would be a

22 better practice to put your foot at either location, X

23 or Y, rather than standing on top of a padeye while

24 you're trying to loosen a cone?

25     A.  No.


1   Q. Why wouldn't you agree with that?

2   A. I believe -- we're talking about this padeye
3   (indicating); right, John -- excuse me -- Mr. Lacy?
4   This one, not that one; right?

5   (Indicating) Placing his foot on this one I
6   really believe gives him a good, solid footing to
7   brace himself so he can do the job he was intending to
8   do right directly above him.

9   Q. Well, I mean, do you know which one of those
10  two padeyes he actually stood on?

11  A. (Indicating) This one is the one I
12  understood he stood on.

13  Q. Okay. So we'll put a "1" with a circle
14  around it.

15  A. Okay.

16  Q. And I'll show you Exhibit 14 for
17  identification, which is another photograph that I
18  think actually shows you taking a measurement.

19      (Defendant's Exhibit No. 14 marked for
20      identification.)

21  MR. LACY: Q. I'll put a "Y" again in the
22  area off to the side of the padeye that he was
23  standing on.

24  And can you think of any reason why he could
25  not have put his foot at location Y on Exhibit 14?

```
 1        A.  No.  If it was a wide enough space there, I
 2   think he could have.  There would be no reason why he
 3   couldn't have if it's wide enough.
 4        Q.  Well, as you look at that photograph, does
 5   it not appear to be wide enough?
 6        A.  It's hard to tell.  It's probably wide
 7   enough.
 8        MR. LACY:  Okay.  Let's just take a
 9   two-minute break here and I'll talk to Barbara a
10   second.
11        (Break taken.)
12        MR. LACY:  Back on the record.
13        Q.  Captain, just a couple of follow-up things
14   here in connection with your opinion.
15        You had stated in the first opinion that the
16   animal waste created an unreasonably dangerous
17   condition, or words to that effect.
18        Do you remember that?
19        A.  It was one of the things that caused it to
20   be an unsafe situation for the longshoremen.
21        Q.  Right.
22        A.  An unreasonably dangerous condition; you're
23   right.
24        Q.  In connection with just the animal tenders,
25   based upon that statement, what was it that they did
```



```
1  STATE OF CALIFORNIA    )
                          )
2  COUNTY OF SAN FRANCISCO )
```

3       I, MARY DUTRA, a Certified Shorthand Reporter of

4  the State of California, duly authorized to administer

5  oaths pursuant to Section 2025 of the California Code

6  of Civil Procedure, do hereby certify that

7                    ROBERT E. RILEY,

8  the witness in the foregoing deposition, was by me

9  duly sworn to testify the truth, the whole truth and

10 nothing but the truth in the within-entitled cause;

11 that said testimony of said witness was reported by

12 me, a disinterested person, and was thereafter

13 transcribed under my direction into computer-aided

14 transcription and is a true and correct transcription

15 of said proceedings.

16      I further certify that I am not of counsel or

17 attorney for either or any of the parties in the

18 foregoing deposition and caption named, nor in any way

19 interested in the outcome of the cause named in said

20 caption.

21      Dated the 13th day of September, 2005.

22

23              *Mary Dutra*
                MARY DUTRA
24              CSR No. 9251 (California)

25